**M.W., Appellant,**

v.

**STATE of Alaska, DEPARTMENT OF HEALTH AND SOCIAL SERVICES, Appellee.**

**No. S-9557.**

Supreme Court of Alaska.

April 20, 2001.

---

3. *See id.*

4. *See id.*

6. Alaska R. Civ. Proc. 99.

7. *See Silvers*, 999 P.2d at 790; *Carvalho v. Carvalho*, 838 P.2d 259, 262 (Alaska 1992).

Stuart G. Ross, Law Office of Stuart G. Ross, Anchorage, for Appellant.

Kelly Gillilan–Gibson, Assistant Attorney General, Anchorage, and Bruce M. Botelho, Attorney General, Juneau, joined by Robert R. Polley, Assistant Public Advocate, and Brant McGee, Public Advocate, Anchorage, as guardian ad litem, for Appellee.

Before FABE, Chief Justice,
MATTHEWS, EASTAUGH, BRYNER, and
CARPENETI, Justices.

### OPINION

BRYNER, Justice.

## I. INTRODUCTION

Mark W. appeals the superior court's termination of his parental rights to his daughter, Michelle.[1] The superior court determined that Michelle was a child in need of aid because she had been abandoned by Mark; that Mark failed, within a reasonable time, to remedy the conduct or conditions that placed Michelle at a substantial risk of harm; that the Department of Health & Human Services made reasonable efforts to provide family remedial services; and that it was in Michelle's best interests to terminate Mark's parental rights. Because the record supports the superior court's factual findings and the court adequately applied the law to these facts, we affirm the termination order.

## II. FACTS AND PROCEEDINGS

On July 5, 1998, Laura F. gave birth to a daughter, Michelle. Mark W. is Michelle's father. Because both mother and daughter tested positive for cocaine, the Department of Health and Social Services (department) received a report of harm. Laura has an extensive history with the department: her substance abuse, psychological problems, and pattern of abusing and neglecting her children have resulted in the termination of Laura's parental rights as to her previous four children. Laura's history prompted the department to assume custody of Michelle at birth.

A department social worker, Linda Gonzales, met with Mark at the hospital soon after Michelle's birth. Mark claimed that he could care for Michelle, but he refused to provide information on his living arrangements. His refusal to cooperate and his relationship with Laura caused the department to place Michelle in a foster home when she was three days old.

Patricia Driggins, the social worker assigned to the case, investigated the possibili-

---

1. To protect the anonymity of the parties, we use pseudonyms throughout this opinion.

ty of placing Michelle with her father. She visited Mark at his residence—the Ingra House—a boarding house that permits convicted felons to reside there. During this visit, Driggins explained that the Ingra House was an unsuitable place for a newborn and that Mark would need to find suitable housing before the department could consider placing Michelle in his custody.

A month later, Driggins met with Mark and Laura at an initial case conference to discuss their case plan for receiving custody of Michelle. The plan required Mark to complete a parenting class, obtain suitable housing, and visit with Michelle. Although Mark promised that he would call to set up visitation, he failed to recontact the office. During the year that followed—between August 12, 1998, and July 1999—Mark continued living in the Anchorage area but never visited or spoke to his daughter. From Michelle's birth to the November 1999 termination trial Mark, by his own account, saw Michelle "[m]aybe three-and-a-half [times]. If you count the times [he'd] seen her in a vehicle."

After the August 1998 case conference, Driggins was unable to locate either parent. She consulted Mark's last known place of employment, Laura's probation officer, the phone book, and other sources, but had no success. Because Laura and Mark did not comply with the case plan, the department petitioned to terminate their parental rights in April 1999 and then published notice of the proceedings in the Anchorage Daily News.

In July 1999 Laura gave birth to another child, John, also fathered by Mark. The department received a report of harm, assumed custody of John at birth, and placed him with Michelle's foster family.

Mark treated his newborn son differently. He began complying with his case plan, and eventually fulfilled its requirements by obtaining a substance abuse assessment, completing parenting classes, and visiting John.

In October 1999 the department placed John with his father.

Meanwhile, Michelle's termination petition proceeded toward trial. At the termination trial, in November 1999, both parents admitted to abandoning Michelle. They offered no specific reasons for failing to visit her or comply with her case plan. Laura testified that she had been "trying to get [her] life together," and Mark explained that he had been "endeavoring to help [Laura]." Mark acknowledged that he could have visited Michelle; he made no attempt to excuse or defend his actions.

At the end of the trial, Superior Court Judge Karen L. Hunt terminated Laura's and Mark's parental rights. Michelle remains with her foster family. Mark appeals.[2]

## III.  DISCUSSION

### A.  Standard of Review

▮▮▮  We apply the clearly erroneous standard when reviewing a trial court's termination findings;[3] clear error arises only when our review of the entire record leaves us with a definite and firm conviction that the superior court made a mistake.[4] Whether the superior court's factual findings satisfy applicable child in need of aid (CINA) statutes and rules is a question of law that we review de novo.[5]

### B.  The Superior Court Did Not Err in Terminating Mark's Parental Rights.

#### 1.  The superior court's findings

Under AS 47.10.088(a), a court entering an order that terminates parental rights must find: (1) that the child is in need of aid under AS 47.10.011; (2) that the parent failed to remedy the conduct or conditions that placed the child at a substantial risk of harm or failed to remedy the conduct or conditions within a reasonable time; and (3) that the department made reasonable efforts to provide family support services.[6] Furthermore,

---

**2.**  Laura has not appealed.

**3.**  See D.M. v. State, Div. of Family & Youth Servs., 995 P.2d 205, 207 (Alaska 2000).

**4.**  See id. at 207–08.

**5.**  See id. at 207.

**6.**  See AS 47.10.088(a).

the court must "consider the best interests of the child"[7] and any fact relating thereto.[8]

Here the superior court based its order on the following findings:

b. [Mark] has had only brief contact with the minor since the minor's birth on July 5, 1998. Although the evidence suggests that the father remained in the Anchorage area, there were few attempts to contact the child or to contact the Department and work a treatment plan.

. . . .

d. The father's conduct constitutes a conscious disregard of parental obligation, which has resulted in the destruction of the parent-child relationship.

. . . .

j. The father's lack of contact with the child for a period exceeding six months, including failure to provide for the physical, mental, social, or emotional needs of the child since the minor's birth, constitutes substantial neglect and abandonment by the father.

l. [Laura and Mark] were not truthful to the court regarding the nature of their relationship. [Mark] testified that he would continue to put [Laura's] needs before the needs of his children.

. . . .

7. That based upon [Mark's] testimony, in addition to the testimony of the social workers, the court finds clear and convincing evidence that the parental conduct which caused the minor to be a child in need of aid is likely to continue if the parental rights of [Mark] are not terminated.

8. There is clear and convincing evidence that the parents have not remedied the conduct or conditions in the home that place the child at substantial risk of harm.

9. Pursuant to AS 47.10.088[ (a)(1)](B)(ii), the parents have failed, within a reasonable time, to remedy the conduct or conditions in the home that place the child in substantial risk so that returning the child to the parents would place the child at substantial risk of physical or mental injury.

10. The department has shown by a preponderance of the evidence that it has made reasonable efforts to provide remedial services to the family pursuant to AS 47.10.086.

11. Termination of parental rights is in the best interests of the child.

2. *The superior court correctly determined that Michelle was a child in need of aid.*

The superior court relied on three separate grounds in finding Michelle to be a child in need of aid under AS 47.10.011:[9] Michelle's parents (1) abandoned her;[10] (2) were unwilling or unable to provide care, supervision, or support;[11] and (3) engaged in conduct or created conditions that placed her at a substantial risk of suffering substantial physical harm.[12] Mark does not dispute or appeal these findings.

7. AS 47.10.088(c).

8. *See* AS 47.10.088(b).

9. AS 47.10.011 provides, in relevant part:

Subject to AS 47.10.019, the court may find a child to be a child in need of aid if it finds by a preponderance of the evidence that the child has been subjected to any of the following:
(1) a parent or guardian has abandoned the child as described in AS 47.10.013, and the other parent is absent or has committed conduct or created conditions that cause the child to be a child in need of aid under this chapter;
. . . .
(3) a custodian with whom the child has been left is unwilling or unable to provide care, supervision, or support for the child, and the whereabouts of the parent or guardian is unknown;
. . . .
(6) the child has suffered substantial physical harm, or there is a substantial risk that the child will suffer substantial physical harm, as a result of conduct by or conditions created by the child's parent, guardian, or custodian or by the failure of the parent, guardian, or custodian to supervise the child adequately[.]

10. *See* AS 47.10.011(1) and 47.10.013 (defining "abandonment").

11. *See* AS 47.10.011(3).

12. *See* AS 47.10.011(6).

3. *The superior court correctly deter-*
*mined that Mark failed to act within a*
*reasonable time to remedy the aban-*
*donment.*

Alaska Statute 47.10.088(a)(1)(B) required the court to find, by clear and convincing evidence, that Mark

(i) ha[d] not remedied the conduct or conditions in the home that place[d] the child at substantial risk of harm; or

(ii) ha[d] failed, within a reasonable time, to remedy the conduct or conditions in the home that place[d] the child in substantial risk so that returning the child to the parent would place the child at substantial risk of physical or mental injury.... [13]

Mark asserts that, by the time of the termination trial, he had remedied the conduct or conditions that placed Michelle at risk of harm. He had complied with his son's case plan, and the department returned John to him in October 1999. But Mark's argument ignores the superior court's finding that he failed to remedy the conduct or conditions that placed Michelle at risk of harm "within a reasonable time," as required under AS 47.10.088(a)(1)(B)(ii).

■ Mark does recognize that Dr. Richard Lazur, the state's expert, "testified how important it is for a child to bond with [her] parents during the crucial early months of life and how necessary it was for parents to visit with their children." Further, he admits that he now understands the significance of bonding with a child in the first few months of life and how it would hurt John to be taken away from his father. Yet Mark inexplicably urges us to find that one year is a reasonable time to remedy the effects of his abandonment under AS 47.10.088(a)(1)(B)(ii). We disagree.

The state cites two cases, *In re H.C.*[14] and *O.R. v. State, Department of Health & Social Services*,[15] in support of its argument that a parent's attempt to resolve abandonment by reappearing does not remedy the conduct unless the attempt occurs within a reasonable amount of time. Although the statute does not define what is a "reasonable amount of time," the state argues that abandoning a child for one year before returning is obviously unreasonable.[16] The state also points to legislative findings that indicate the importance of expediting the placement process for children under six years of age.[17] Here, Mark failed to contact the agency from August 1998 through July 1999 and made no efforts to establish a relationship with Michelle for over a year after her birth.

We find the state's argument persuasive and hold that the superior court did not err in finding that Mark failed to remedy the conduct or conditions within a reasonable time under AS 47.10.088(a)(1)(B)(ii).

4. *The superior court properly found that*
*the department made "reasonable ef-*
*forts" to provide family support ser-*
*vices.*

■ Alaska Statute 47.10.086(a) requires the department to

make timely, reasonable efforts to provide family support services to the child and to the parents or guardian of the child that are designed to prevent out-of-home placement of the child or to enable the safe return of the child to the family home, when appropriate, if the child is in an out-of-home placement. The department's duty to make reasonable efforts under this subsection includes the duty to

---

**13.** AS 47.10.088(a)(1)(B). The state correctly points out that this provision did not require the superior court to find that Mark's conduct is likely to continue. Although the pre 1998 version of the statute required such a finding, the legislature omitted this requirement from the new statute. *See* former AS 47.10.080(c)(3). Therefore, Mark's first issue on appeal is moot.

**14.** 956 P.2d 477 (Alaska 1998).

**15.** 932 P.2d 1303 (Alaska 1997).

**16.** Although abandonment may result because of various conduct, the legislature has determined that a child is abandoned if the parent "failed for a period of at least six months to maintain regular visitation with the child." AS 47.10.013(a)(3). Mark did not maintain regular visitation for over one year.

**17.** *See* AS 47.05.065(5).

(1) identify family support services that will assist the parent or guardian in remedying the conduct or conditions in the home that made the child a child in need of aid;

(2) actively offer the parent or guardian, and refer the parent or guardian to, the services identified under (1) of this subsection; the department shall refer the parent or guardian to community-based family support services whenever community-based services are available and desired by the parent or guardian; and

(3) document the department's actions that are taken under (1) and (2) of this subsection.

The superior court found by a preponderance of the evidence that the department's efforts were reasonable.[18]

Mark challenges this finding. But Mark was present at the initial case conference, where he and Laura were advised of the need to "work out" a visitation schedule and complete parenting classes. Mark asked no questions then, and later testified that he understood the basic requirements of the plan and the importance of establishing a child-parent relationship. Mark nonetheless complains that he never received a written copy of the case plan. He speculates that if he had received a written copy, "it might have given [him] clearer notice of what DFYS expected him to accomplish prior to the return of his daughter." Yet at the same time, Mark recognizes that even if he had received a written copy, it might not have made any difference.

Although Mark also argues that he received no mail or communications from the department after August 11, 1998, he admits that he moved around frequently and failed to provide the department with forwarding information; moreover, he failed to contact the department after August 1998.

Furthermore, Driggins testified that her efforts were reasonable: "Reasonable efforts [under AS 47.10.086(a)] mean you identify what the client needs to do, and we very clearly did that, and make referrals for services." Driggins and the guardian ad litem called Mark's last known place of employment and discovered that he no longer worked there. The department had no contact information for Mark's family or friends, making it difficult for Driggins to locate him. Driggins completed an affidavit of diligent inquiry on April 13, 1999, noting that her efforts to locate Mark included checking phone books, utility applications, permanent fund dividend applications, and criminal records. And finally, the state reminds us that, in making its reasonable efforts finding, the superior court could consider Mark's unwillingness to engage in his case plan.[19]

Given these circumstances, we conclude that the record supports the superior court's finding that the department made reasonable efforts under AS 47.10.086(a).

5. *The superior court did not err in determining that terminating Mark's parental rights was in Michelle's best interests.*

Mark's last point addresses the superior court's best interests finding.[20] Mark argues that it is poor public policy to separate siblings. Because he has custody of John, Mark asserts, it is in Michelle's best interests to be

---

**18.** *See* AS 47.10.088(a)(2). This "reasonable efforts" standard should be distinguished from the higher "active efforts" requirement under the Indian Child Welfare Act (ICWA), 25 U.S.C. 1912(d) (1983). *See infra* note 19.

**19.** *Cf. A.M. v. State,* 945 P.2d 296, 305–06 (Alaska 1997) (dealing with the "active efforts" requirement of 25 U.S.C. § 1912(d)).

**20.** AS 47.10.088 provides, in relevant part:

(b) In making a determination under (a)(1)(B) of this section, the court may consider any fact relating to the best interests of the child, including

(1) the likelihood of returning the child to the parent within a reasonable time based on the child's age or needs;

(2) the amount of effort by the parent to remedy the conduct or the conditions in the home;

(3) the harm caused to the child;

(4) the likelihood that the harmful conduct will continue; and

(5) the history of conduct by or conditions created by the parent.

(c) In a proceeding under this chapter involving termination of the parental right of a parent, the court shall consider the best interests of the child.

in his home with her brother. In advancing this argument, Mark suggests that Michelle and John formed a four-month bond while they were living with Michelle's foster parents. But this unsupported contention directly conflicts with Dr. Lazur's testimony that very young children would not form a close bond within four months.[21]

Moreover, the state correctly points out evidence indicating that it is in Michelle's best interests to remain with her foster family because she had bonded to them. At trial Dr. Lazur testified that Michelle would view someone like Mark—whom she had seen three times in one year—as a stranger, even though he was her biological parent. Dr. Lazur further testified that to remove Michelle from

> a consistent environment where the child knows a caregiver, is able to rely upon a particular individual to take care of her needs or his needs, to then suddenly find him or herself removed from that situation would cause tremendous amount of anxiety, a sense of horror, a sense of terror and a sense of unsafety in the world. It

would probably leave … irreparable psychological damage to the child.

 We conclude that the record supports the superior court's conclusion that it is in Michelle's best interests to terminate Mark's parental rights. ["I]n a termination trial, the best interests of the child, not those of the parents, are paramount."[22] Michelle is thriving, happy, and well-adjusted at her foster parents' home; she has bonded with her family. The superior court could properly find that removing Michelle from the only family she has ever known would likely cause her irreparable harm.

## IV.  *CONCLUSION*

For these reasons, we AFFIRM the superior court's termination of Mark's parental rights.

---

**21.** Although Mark claims that termination of his parental rights to Michelle will "forever separate[ ] siblings," this is unsupported and refuted by the foster mother's testimony. The foster mother testified that she and her husband have arranged visitation between Michelle and Mark and would encourage Michelle to have future contact with her biological family. In fact, the foster parents are godparents to one of Michelle's half-siblings.

**22.** *A.B. v. State, Dep't of Health & Social Servs.,* 7 P.3d 946, 954 (Alaska 2000) (quoting *A.A. v. State, Dep't of Family & Youth Servs.,* 982 P.2d 256, 260 (Alaska 1999)).