JACK C., Appellant,

v.

STATE of Alaska, DFYS, Appellee.

No. S–10690.

Supreme Court of Alaska.

May 2, 2003.

---

Michael P. Heiser, Ketchikan, for Appellant.

Stacie L. Kraly, Assistant Attorney General, and Gregg D. Renkes, Attorney General, Juneau, for Appellee.

Before: FABE, Chief Justice,
MATTHEWS, EASTAUGH, BRYNER, and
CARPENETI, Justices.

*OPINION*

EASTAUGH, Justice.

# I. INTRODUCTION

Under authority of AS 47.10.088, the superior court terminated Jack C.'s[1] parental rights to his two young daughters. Jack C. claims on appeal that the court clearly erred in finding that the state proved by clear and convincing evidence that he had failed to remedy, within a reasonable period of time, the conduct that placed his two children at substantial risk, and in finding that returning the children to him would place them at substantial risk of physical or mental injury. The superior court did not clearly err. Essentially undisputed evidence established that Jack C. had sexually abused both children and that he failed to complete individualized treatment programs for sexual abuse, substance abuse, and anger management within a reasonable time. We therefore affirm the termination of his parental rights.

# II. FACTS AND PROCEEDINGS

Jack C. and Paula R. are the parents of Nina C. and Julie C. Julie was born in March 1993 and Nina was born in March 1995. During Jack and Paula's "off and on" relationship, the couple regularly abused alcohol and drugs and Jack engaged in domestic violence against Paula. Their relationship ended in 1998. Jack, Julie, and Nina moved to Alaska in January 1999.[2]

In December 1999 Nina, then age four, complained to her live-in babysitter, Kelly V., that her "butt hurt." When Kelly asked her why she was in pain, Nina responded that her Dad "puts his wiener in my mouth, pees in my mouth, and sticks his wiener in my private parts." Kelly reported Nina's complaints to the Alaska Department of Health and Social Services, Division of Family and Youth Services (DFYS). Kelly also reported that Jack used drugs and that he called the girls names. She also recalled an incident in which Jack arrived at her home, drunk, with both girls in the car. On the same day Kelly reported the abuse, Sue Patrick, a DFYS social worker, interviewed the two children,

---

1. This opinion uses pseudonyms for all family members.

2. Jack and Paula were both incarcerated in 1998. During the parents' incarceration, the children lived with Jack's mother. The State of Washington filed a petition against both parents

for child support on behalf of Julie. The court entered judgment against Jack and Paula for child support for Julie and awarded Jack custody of Julie. No mention was made of custody or child support for Nina. Paula was still incarcerated when Jack brought the girls to Alaska.

who confirmed Kelly's report. Nina also told the social worker that her father had hit her.

DFYS immediately took emergency custody of Nina and Julie.[3] DFYS petitioned the superior court the next day for an adjudication that Nina and Julie were children in need of aid and for an order committing the children to DFYS custody. After conducting a hearing on the state's petition, Superior Court Judge Thomas M. Jahnke held that there was probable cause to believe that the children were in need of aid under AS 47.10.011(1), (6), (7), (9), and (10), and that it would not be in the children's best interests to be placed back in Jack C.'s home. The superior court committed the children to the temporary custody of DFYS and also ordered both parents to participate "in the development of a case plan and ... family support services as set forth in that case plan." The court forbade the parents to have direct or indirect contact with the children unless they arranged visitation through DFYS.

Paula's DFYS case plan required that she maintain regular contact with the children, complete a residential substance abuse and alcohol program, follow through with all treatment recommendations, and stay clean and sober for six months. DFYS planned to conduct a home study for Paula to determine whether it should place the two girls with her. Jack's DFYS case plan required that "he be evaluated for individualized programs for substance abuse/alcohol treatment, anger management, parenting[,] ... and sex offender treatment (SOTP), and that he complete the recommended programs."

In an amended petition for an adjudication that Julie and Nina were children in need of aid, DFYS also alleged that Julie had disclosed that her father "choked her once when he was drunk and she could not breathe."

In February 2000 an indictment charged Jack with two counts of sexual abuse of a minor in the first degree under AS 11.41.434(a)(2)(A) for sexual penetration of Nina.

The March 2000 report of guardian ad litem (GAL) Patricia Muzzana reported that she had observed that both girls had engaged in "sexual acting out" and were "knowledgeable beyond their years in sexual matters." The GAL recommended that the children "remain in the custody of the Department of Health and Social Services for at least six months or until a relative placement can be determined and approved."

Judge Jahnke conducted the adjudication hearing in March 2000, and per the parties' stipulation ordered that the children remain in DFYS custody for six more months while DFYS conducted home studies of the children's relatives. Jack requested that either his mother, Mary C., or his sister, Pilar C., have custody of the girls. Paula's eldest daughter, Billi R., wanted the girls placed with her. The court again ordered Jack and Paula to participate in the family support services recommended by DFYS and to work with the division to update their case plans.

In August 2000 DFYS filed another petition to extend its custody of the children up to one year. A report DFYS submitted in support indicated that Jack had not completed his sex offender treatment program and was "not willing to talk to any mental health professionals about any subject until his criminal case [was] resolved." The report also indicated that Jack was not working on his alcohol and drug problem with "any particular focus."

DFYS's report also described a July 2000 incident between Jack and his daughters. Jack had approached them while they were on a day-care field trip. He hugged the two girls and told them that he loved them. This unsupervised contact was a direct violation of the superior court's order that Jack not have direct or indirect contact with the children unless it was arranged with DFYS. Because of the incident, Julie became "hysterical" and Nina "was able to voice her fear that he was coming back." Superior Court Judge Trevor

---

**3.** DFYS had investigated two previous reports of abuse and neglect for Jack C.'s family, but those reports were not confirmed.

N. Stephens extended DFYS's custody of the two girls for one year.[4]

In November 2000, eleven months after taking emergency custody of the girls, DFYS filed a report recommending that Julie and Nina remain in long-term foster care permanently. DFYS reported that it had determined that the girls' mother, Paula, was not a proper placement due to drug and alcohol abuse and that Jack's mother and his sister were not proper placements either. DFYS had not yet completed a home study for Paula's eldest daughter, Billi R. DFYS also reported that Jack and Paula had not complied with the requirements of their respective case plans. The report concluded that Jack had been "minimally compliant" with respect to his participation in the parenting classes and alcohol and drug program. He also had not completed sex offender treatment because he "refuse[d] to address any issues related to the allegations of sexual or physical abuse due to his pending criminal trial." Paula had not had any contact with her children in over three months and had not sought admission to a residential drug and alcohol treatment program.

A week later, DFYS filed a second amended child-in-need-of-aid petition informing the court that Julie had disclosed that Jack had sexually abused her and that Jack had been charged by indictment in October 2000 with sexual abuse of a minor in the first degree for sexual penetration of Julie in 1999.[5]

In May 2001 Jack pleaded guilty to a reduced charge of one count of sexual abuse of a minor in the second degree. Superior Court Judge Michael A. Thompson sentenced Jack to six years in prison, with two years suspended, for a total of four years of incarceration. Judge Thompson recommended that Jack "be classified in a sex offender program" during incarceration at Meadow Creek Correctional Center. Judge Thompson also placed Jack on ten years probation following his release, during which he was to have "no contact, direct or indi-

rect" with his daughters or any other females under the age of sixteen "without the prior written permission of the sex offender treatment provider and the probation officer." As a condition of probation, Judge Thompson also ordered that Jack participate in any sex offender treatment programs that the Department of Corrections or a probation officer might require.

Jack appealed his sentence to the Alaska Court of Appeals. He argued that the trial court erred in not postponing the sentencing hearing to allow him to complete a sex offender evaluation and also that his four-year prison sentence and ten-year probation period were excessive.

After Jack was sentenced, DFYS filed a second report for a permanency hearing in June 2001 recommending that the superior court terminate Jack and Paula's parental rights and that Julie and Nina be adopted by extended family. DFYS concluded that Jack had failed to avail himself of parenting programs or sex offender treatment programs before his incarceration. Paula had not had contact with the girls since September 2000 and still had not sought treatment for her drug and alcohol abuse.

Jack began serving his sentence in June 2001. He entered a sex offender treatment program at the Meadow Creek Correctional Center on September 4, 2001. He admitted to a history of drug addiction, sexual promiscuity, and violent behavior. He also admitted to sexually abusing both daughters.

The sex offender treatment team at Meadow Creek estimated that Jack needed at least twenty-nine months to complete an individual treatment plan. The team also recommended that he focus on his anger management, parenting, and substance abuse issues. The team reported that Jack had also been involved in a number of incidents involving "anger and crossing the boundaries of oth-

---

4. This case was reassigned to Judge Stephens after Judge Jahnke retired.

5. When Julie was interviewed by investigators, she stated that her father put his hand inside her panties and touched her genitals. Julie stated

that she took her father's hand away and told him, "Stop, Dad. I mean it." Julie refused her father's request to touch his genitals. Julie added that her father told her, "Don't tell ..., or I'll get in trouble."

ers" while participating in the treatment program.

DFYS filed a petition in November 2001 to terminate parental rights of both parents. DFYS argued that because Jack had sexually and physically abused his daughters and had failed to fulfill the requirements of his case plan, the superior court should terminate his parental rights. DFYS also pointed out that because Jack's four-year prison sentence and ten-year probation period forbade him from having any contact with his daughters or any female under the age of sixteen without prior written permission from a sex offender treatment program officer or parole officer, he would not be able "to parent these children at any time during their minority."

In January 2002 Jack was transferred to the Lemon Creek Correctional Center. He was released on bail in February 2002 pending his sentence appeal. The treatment team at Meadow Creek disagreed with his release.

The treatment team removed Jack from the sex offender treatment plan at Meadow Creek in March 2002 for "non-compliance with his Individual Treatment Plan." The treatment team observed that "[h]e was not honest with group, staff, or Treatment Team ... lacked commitment ... [and was] more focused on many issues outside of the Program."

In its discharge summary, the treatment team identified several risk factors that contributed to Jack's sexually abusive behavior and recommended corresponding corrective treatment to reduce the likelihood of future sexual abuse by Jack. These risk factors included: Jack's "one-sided mindset," which caused him to seek "that which would satisfy himself" and meant that he was "lacking psychological insight ... and empathy for others"; his substance abuse, sexual promiscuity, theft, and drug-dealing; his conflicts with the children's mother, Paula; and his unsupervised access to his minor daughters.

Jack's total criminality score on the Hare PCL–R scale classified him as psychopathic. The treatment team also found that he posed a "high" recidivism risk for sexual assault

under the Hanson/Harris rating. He was also diagnosed under DSM IV as having polysubstance dependence and antisocial personality disorder. The team classified Jack as a "Level III" offender, an individual with "a higher risk to reoffend as an untreated sex offender." As a Level III offender, he was ineligible "for victim contact and/or family reunification where a former or potential victim is in residence."

The court of appeals ultimately denied Jack's appeal and affirmed the superior court's sentence and probation period. The court concluded that "[g]iven the seriousness of [Jack's] conduct and [his] apparent unwillingness or inability to directly acknowledge that he sexually abused his daughters, Judge Thompson was justified in ... [choosing] a 10–year term of probation so that [Jack] would be under Department of Corrections supervision until his children were significantly older."

A hearing on DFYS's petition to terminate Jack and Paula's parental rights commenced in May 2002. Paula did not attend. Jack requested that the court continue the hearing so that he could obtain a sex offender treatment evaluation. The court agreed to bifurcate the hearing, permitting the state to present its evidence on the scheduled trial date and allowing Jack to present his evidence in June 2002. Lori Hudson, a DFYS social worker, testified in May and on rebuttal in June that although Jack completed general programs designed for the general public, he had not completed the recommended individual treatment programs which the case plan required. Jack testified in June that he had completed the programs specified in his case plan. He testified that he had completed parenting and anger management programs and received an alcohol/substance abuse evaluation. He also admitted that he had sexually abused both children.

Judge Stephens held that the division had proved by clear and convincing evidence that Julie and Nina were children in need of aid under AS 47.10.011(1), (6), (7), and (10)[6] and that it would not be in the children's best

---

6. AS 47.10.011 provides in part:

[T]he court may find a child to be a child in need of aid if it finds by a preponderance of

interests to return them to Jack's custody because he "is an untreated sex offender at a high risk to reoffend." The superior court further held that the children should not be in Jack's custody because he had "failed to remedy the conduct ... that placed [his daughters] in substantial risk of harm" by not completing the individualized anger management, parenting, and alcohol/substance abuse programs required by his case plan. The court noted that Jack did not complete a sexual offender treatment program, and that the SOTP requirement was the most important of the programs Jack's case plan required. The court also held that DFYS had proved by a preponderance of the evidence that it had made reasonable efforts to allow the children to return to Jack or Paula. The court therefore terminated Jack and Paula's parental rights and responsibilities under AS 47.10.088. Judge Stephens then committed both children to Department of Health and Social Services custody for adoptive purposes under AS 47.10.080(d).

Jack appeals the termination of his parental rights. His main argument is that it was clear error to find that he had failed to remedy within a reasonable period of time the conduct that placed the children at risk.

## III. DISCUSSION

### A. Standard of Review

 We apply the clearly erroneous standard when reviewing the superior court's

the evidence that the child has been subjected to any of the following:
(1) a parent or guardian abandoned the child as described in AS 47.10.013, and the other parent is absent or has committed conduct or created conditions that cause the child to be a child in need of aid under this chapter;
....
(6) the child has suffered substantial physical harm ... as a result of conduct by or conditions created by the child's parent [or] guardian ...;
(7) the child has suffered sexual abuse, ... as a result of conduct by or conditions created by the child's parent [or] guardian ...;
....
(10) the parent, guardian, or custodian's ability to parent has been substantially impaired by the addictive or habitual use of an intoxicant, and the addictive or habitual use of the intoxicant has resulted in a substantial risk of harm to the child ....

factual findings.[7] "[C]lear error arises only when our review of the entire record leaves us with a definite and firm conviction that the superior court made a mistake."[8] We review de novo whether a superior court's factual findings satisfy the applicable CINA rules and statutes.[9]

**B. The Trial Court Did Not Err in Holding that DFYS Proved by Clear and Convincing Evidence that Jack Failed Within a Reasonable Period of Time To Remedy the Conditions that Placed His Children at Substantial Risk of Harm.**

Under AS 47.10.088(a)(1)(B), a court may terminate parental rights to a child if the court finds by clear and convincing evidence per AS 47.10.011 that the child is a child in need of aid and that the parent:

(i) has not remedied the conduct or conditions in the home that place the child at substantial risk of harm; or

(ii) has failed, within a reasonable time, to remedy the conduct or conditions in the home that place the child in substantial risk so that returning the child to the parent would place the child at substantial risk of physical or mental injury.[10]

 Jack does not challenge the finding that his children are in need of aid under AS

7. See M.W. v. State, Dep't of Health & Soc. Servs., 20 P.3d 1141, 1143 (Alaska 2001).

8. Id.

9. Id.

10. AS 47.10.088(a)(1)(B); see also AS 47.10.088(b). AS 47.10.088(b) provides in part:
In making a determination under [AS 47.10.088(a)(1)(B)], the court may consider any fact relating to the best interests of the child, including
(1) the likelihood of returning the child to the parent within a reasonable time based on the child's age or needs;
(2) the amount of effort by the parent to remedy the conduct or the conditions in the home;
(3) the harm caused to the child;
(4) the likelihood that the harmful conduct will continue; and
(5) the history of conduct by or conditions created by the parent.

47.10.011(1), (6), (7), or (10). Rather, he challenges the trial court's finding that DFYS proved by clear and convincing evidence under AS 47.10.088 that he had failed to remedy, within a reasonable time, the conduct or conditions that placed his daughters at substantial risk of harm. Jack argues that because he has made "substantial efforts" to remedy his behavior and deserves additional time to complete his case plan, it was improper to terminate his parental rights.

Jack's arguments are unpersuasive. There is no legitimate dispute about the facts discussed in Part II above. The record demonstrates that Jack has not completed the sex offender treatment program (SOTP) prescribed by his DFYS case plan. While incarcerated, he participated in a SOTP for only four months before he was released on bail to appeal his criminal sentence and then was discharged from the program. The SOTP treatment team determined that Jack needed at least twenty-nine months to complete his individual treatment program. Having participated in only four of the recommended twenty-nine months of treatment, Jack remains essentially untreated. Jack testified at his termination trial that Dr. Tony Mander, his own expert, had recommended that Jack participate in a SOTP. Because Jack must still participate in about two more years of treatment, he cannot complete the remainder of the required SOTP within a reasonable time.

Jack has had sufficient time to complete or substantially complete a sex offender treatment program. DFYS developed Jack's case plan in early 2000, soon after DFYS took emergency custody of his children in December 1999. Before incarceration, Jack did not seek sexual offender treatment offered by DFYS. Nor did he avail himself of any of the services DFYS offered him before he went to jail, because he was unwilling to discuss the details of the sexual abuse of his daughters while his criminal case was pending. Assuming there is a tension between one's constitutional right not to incriminate oneself and one's rights as a parent, time was nevertheless passing in the lives of Jack's young children. At the conclusion of the termination trial in June 2002, Jack's children had already been in DFYS custody for nearly two and a half years. Jack has not consistently demonstrated any initiative to remedy the behavior that placed his daughters at a substantial risk of harm. Because of the children's young age, it is especially important that they be placed in permanent homes expeditiously.[11] As DFYS persuasively argues, the children "should not be denied permanency while they wait for their father to work on his case plan."

There is no doubt that Jack's propensities place his children at risk of substantial harm. As an untreated sex offender who was assessed as having a "high" risk of recidivism, Jack poses a significant and particularized threat of further sexual abuse. Further, the consequences of the threat he poses are grave; his children have already been severely traumatized by his conduct. Even after the children were removed from Jack's custody, they were significantly traumatized by a brief encounter with him in a public setting. Subsequent abuse would be even more traumatizing.

The record also establishes that Jack did not complete the individualized anger management, parenting, or substance abuse treatment programs his case plan required. Although Jack completed general anger management and parenting programs, and received a substance abuse evaluation, he did not follow through with any of the programs' individual recommendations for treatment.

---

**11.** *See* AS 47.05.065(5). AS 47.05.065 provides in part:
The legislature finds that
. . . .
(5) numerous studies establish that
(A) children undergo a critical attachment process before the time they reach six years of age;

. . . .
(C) it is important to provide for an expedited placement procedure to ensure that all children, especially those under the age of six years, who have been removed from their homes are placed in permanent homes expeditiously.

The superior court did not clearly err in finding that DFYS proved by clear and convincing evidence that Jack had failed to remedy the conduct that placed the children in substantial risk of harm. Nor did it clearly err in finding that returning them to his custody would place them at substantial risk of physical or mental injury.

Jack also argues that AS 47.10.080(*o*) applies to this case. That statute permits a court to determine that a parent's incarceration is a legitimate ground for terminating parental rights under some circumstances.[12] Jack argues that there is no clear and convincing evidence under AS 47.10.080(*o*)(3) that he failed to make adequate provisions for his children's care while he was incarcerated. It is irrelevant here that Jack allegedly made adequate provision for the children's care during his incarceration. Alaska Statute 47.10.080(*o*) only applies when the trial court terminates parental rights under AS 47.10.080(c)(3). Jack's rights were terminated under AS 47.10.088, not AS 47.10.080(c).

 Jack briefly asserts in the conclusion of his opening brief that the trial court "also erred in finding that DFYS made reasonable efforts to permit [Nina] and [Julie] to return to the custody of their father." But this assertion is unsupported, and the next few sentences in his brief argue a different issue: that Jack made "substantial efforts" to remedy his conduct and made "substantial progress" in his treatment. As seen above, the trial court rejected those contentions, and the record clearly establishes that Jack did not complete the individualized treatment that he needs. This argument is consequently without merit.

**12.** AS 47.10.080(*o*) provides that:

> For purposes of terminating a parent's parental rights under the standards in (c)(3) of this section, the court may determine that incarceration of the parent is sufficient grounds for determining that a child is a child in need of aid under AS 47.10.011 as a result of parental conduct and that the parental rights of the incarcerated parent should be terminated if the court finds, based on clear and convincing evidence, that

## IV. CONCLUSION

We AFFIRM the termination of Jack C.'s parental rights.

(1) the period of incarceration that the parent is scheduled to serve during the child's minority is significant considering the child's age and the child's need for an adult's care and supervision;

(2) there is not another parent willing and able to care for the child; and

(3) the incarcerated parent has failed to make adequate provisions for care of the child during the period of incarceration that will be during the child's minority.