**ROY S., Appellant,**

v.

**STATE of Alaska, DEPARTMENT OF HEALTH & SOCIAL SERVICES, OFFICE OF CHILDREN'S SERVICES, Appellee.**

No. S–14377.

Supreme Court of Alaska.

June 15, 2012.

---

Olena Kalytiak Davis, Anchorage, for Appellant.

Michael G. Hotchkin, Assistant Attorney General, Anchorage, and John J. Burns, Attorney General, Juneau, for Appellee.

Anita Alves, Assistant Public Advocate, and Richard Allen, Public Advocate, Anchorage, for Guardian ad Litem.

Before: CARPENETI, Chief Justice, FABE, WINFREE, and STOWERS, Justices.

## OPINION

PER CURIAM.

1. Jade is the biological daughter of Roy and Sheila.[1] Jade is an Indian child as defined in the Indian Child Welfare Act (ICWA).[2] Roy and Sheila have two older children and Sheila has a daughter from a previous relationship. Between 1998 and 2007, the Office of Children's Services (OCS) received at least 12 reports of drug abuse and child neglect in the family. Before Jade's birth in September 2004, the older children were transferred to OCS custody for two years. Roy and Sheila attempted to complete drug treatment programs but were unsuccessful. Sheila relapsed while pregnant with Jade; her discharge report from the treatment program indicated she tested positive for cocaine in August 2005 and stopped attending treatment sessions or contacting drug counselors in October 2005. Roy was discharged for positive drug tests and missing treatment. His discharge report noted his risk of relapse was "high" and he "did not demonstrate the commitment" to maintain a sober lifestyle.

2. In February 2008, investigators found Sheila at a hotel with drug paraphernalia in the room and arrested her on an outstanding warrant. Sheila did not reveal the children's location. Roy was in Washington state and was difficult to contact. OCS located the children at a family friend's home in July 2008 and placed them in emergency custody. While Jade was generally healthy, her teeth were described as in "horrible" condition, blackened and with visible holes in the top teeth.

3. Both Roy and Sheila lived outside of Alaska for several months after their children were taken into custody. Roy was often unreachable; upon returning to Alaska in February 2009, he canceled or failed to attend several meetings with OCS social workers. OCS often did not have a working number to reach him. Roy participated in the Ernie Turner Center's detoxification program in February 2010. He was diagnosed with opioid dependence with a recommendation for six months' high-intensity residential treatment. Roy told counselors that he had used heroin daily for three years, although he later testified he only said this to get into a residential treatment program and comply

---

1. Pseudonyms are used throughout to protect the privacy of the parties.

2. 25 U.S.C. § 1903(4) (2006).

with the terms of his case plan. Roy entered the Salvation Army residential treatment program in February 2010 and was discharged in May 2010 for the use of a contraband cellphone. Roy stopped participating in drug tests from June 2010 to early 2011.

4. Since being taken into OCS custody in July 2008, Jade has lived in five separate placements. OCS investigated several relative placements. Multiple uncles were unavailable to take the children. Jade was briefly placed with a great-aunt but removed when the great-aunt failed her background check due to a negative reference from a mental health clinician. Jade's paternal grandmother, Donna, who lived in Illinois, was also identified as a potential placement in the fall of 2008. Because she lived in another state, placing the children with Donna necessitated opening a request with Illinois under the Interstate Compact for the Placement of Children (ICPC), which OCS did in November 2008.

5. From January to July 2009, the children lived with their maternal grandmother, Marilyn. The OCS social worker at the time testified that she helped Marilyn with housing, clothing vouchers, furniture, heating assistance, transportation, and referrals to food banks and day care. Marilyn struggled financially and was in treatment for alcoholism. She had trouble getting Jade to medical and dental appointments and told OCS on several occasions that although she wanted to keep the children, she was struggling with the financial responsibility.

6. After a team meeting in July 2009, OCS moved Jade to a foster family, the Mackenzies. The superior court reviewed the decision to send Jade to the Mackenzies at least five times:

- **Permanency Hearing (August 2009):** OCS informed representatives of Jade's tribe that Jade was placed with the Mackenzies. The tribal representative expressed concern that the siblings were not placed in the same home, but OCS responded that no placement had been found to take all the children. The tribal representative stated: "As long as they're doing fine … we'll agree to the placement." The court therefore found that the children's current placements were "in-state, appropriate, and in their best interests." No party objected to these findings or appealed the placement decision. Following the hearing, in early 2010, Jade's maternal cousin, Delia, identified her own home in Alakanuk as a potential placement for Jade.

- **Termination Trial, Part I (June 2010):** Roy clarified at the outset of the termination trial that his primary goal was reunification with Jade and that he wanted Jade placed with her paternal grandmother, Donna, only if reunification was impossible. Roy later noted that he was willing to consent to an adoption by Donna. The superior court found it was not in Jade's interests to live with Donna in Illinois. The court also found that Jade "understands the realness of her connection" to her biological parents and the Mackenzies but did not necessarily have the same connection to Donna. Again, there was no objection to this finding, and no party appealed it. The court continued the termination trial to give the parents another chance to make necessary lifestyle changes.

- **Permanency Hearing (September 2010); Permanency Order (October 2010):** The court recognized the tension between the ICWA placement requirements and the importance of keeping Jade close to her family in Anchorage. Regarding placement, the court stated that "in the long run it's going to be interesting to see … what the evidence finally drives us to. But for now, I think the state has made its proofs." The court clarified that it was finding good cause for Jade to stay with the Mackenzies. No party objected to this ruling. The superior court committed its oral ruling to writing: "[T]he court finds that at this time there is good cause to go outside of the placement preferences stated in 25 U.S.C. § 1915." No party appealed the order.

- **Termination Trial, Part II (March 2011):** Months after the trial court continued the termination proceeding, the trial recommenced. At that point, it be-

came apparent that the parents were continuing to have difficulties following their case plans. Roy had stopped participating in drug tests for several months. Sheila was discharged from her outpatient treatment and failed to return to treatment. At trial, Roy noted his willingness to give consent for his mother Donna or Jade's cousin Delia, who lived in Alakanuk, to adopt Jade. OCS argued the trial should go forward and that, after 20 months of Jade's placement with the Mackenzies, there was good cause to deviate from the ICWA placement preferences. For the first time, Roy and Sheila argued that if OCS had "done what it should have done back in 2008" regarding placement, "we would have had ... an entirely different result." The superior court ruled that the decision not to place Jade in Illinois with Donna was reasonable in light of the goal of maintaining Jade's ties with family in Anchorage: "[W]e can understand that intention to maintain the tie to the extended family here. So I don't think that the choice not to place with [Donna] early on was ... unreasonable."

- **Termination Order (May 2011):** The superior court ruled that good cause continued to exist to deviate from the ICWA placement preferences contained in 25 U.S.C. § 1915(b), based upon testimony of Dr. Laura Jones, the State's expert witness, presented in March 2011, that breaking the bond between Jade and the Mackenzies would have been harmful to Jade. The court adopted the expert's view that "if [Jade], who is now 6 years old, were to be moved from the [Mac-

kenzie] home, she would probably not begin to bond with another care provider until she was between 8 and 11 years old."

7. In its termination order, the superior court also found that termination of parental rights was in Jade's best interests and that OCS made active efforts to prevent the breakup of the Indian family.

8. Roy contests three of the superior court's findings: that OCS made active efforts to prevent the breakup of the Indian family; that termination was in Jade's best interests; and that good cause existed to deviate from the ICWA placement preferences.[3] Sheila did not appeal the superior court's decision.

 9. To terminate parental rights to an Indian child, the superior court must find by clear and convincing evidence that OCS made active efforts to help the parent remedy the problematic behavior or conditions that placed the child in need of aid, and that those efforts were unsuccessful.[4] We review the superior court's factual findings for clear error.[5] Whether the superior court's findings satisfy the requirements of the child in need of aid statutes and rules is a question of law, which we review de novo.[6] Active efforts occur when "the state caseworker takes the client through the steps of the plan rather than requiring that the plan be performed on its own."[7] The record supports the superior court's conclusion that OCS made active efforts to help Roy and Sheila progress with their case plans, even while the parents "intentionally evad[ed] the department." A parent's willingness to cooperate with OCS is "relevant to determining whether the state has met its active efforts burden."[8] Both

**3.** Roy has waived all arguments not briefed on appeal. *See Frank E. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.,* 77 P.3d 715, 719 n. 14 (Alaska 2003) (where father failed "to make any [explicit] argument" regarding an alleged failure of OCS, he "waived any consideration" of that argument because we "will not consider arguments which are inadequately briefed on appeal") (internal quotation marks omitted) (quoting *Martinson v. ARCO Alaska, Inc.,* 989 P.2d 733, 737 (Alaska 1999)).

**4.** 25 U.S.C. § 1912(d) (2006).

**5.** *S.H. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.,* 42 P.3d 1119, 1122

(Alaska 2002) (citing *M.W. v. State, Dep't of Health & Soc. Servs.,* 20 P.3d 1141, 1143 (Alaska 2001)).

**6.** *Id.* (citing *M.W.,* 20 P.3d at 1143).

**7.** *A.A. v. State, Dep't of Family & Youth Servs.,* 982 P.2d 256, 261 (Alaska 1999) (quoting Craig J. Dorsay, The Indian Child Welfare Act and Laws Affecting Indian Juveniles Manual 157–58 (1984)).

**8.** *Jon S. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.,* 212 P.3d 756, 763 (Alaska 2009).

Roy and Sheila were out of contact with OCS for months after their children were taken into state custody in July 2008. Roy was out of state or unreachable until he attended a team meeting in July 2009, and he canceled several meetings after that. He then moved to Soldotna without notifying OCS until a few weeks before the June 2010 hearing. Sheila was out of state until May 2009 and was incarcerated for two months upon her return.[9] OCS arranged for visitation before, during, and after Sheila's drug treatment. The record supports the superior court's conclusion that OCS made active efforts to help Roy and Sheila progress with their case plans in the face of reluctance from the parents to communicate with OCS.

■ 10. Roy also argues that OCS failed to make active efforts to place Jade in an ICWA–compliant household. But ICWA does not "require[ ] consideration of placement options in determining whether to terminate parental rights."[10] Therefore, as the superior court correctly noted, failure to follow ICWA's placement preferences cannot provide a basis for determining that OCS failed to undertake active efforts.[11] The exception is where a placement decision directly affects a parent's ability to participate in remedial efforts.[12] Such a situation does not exist here; in fact, as the trial court found, keeping Jade in Anchorage probably enabled visitation with her biological parents. Indeed, 25 U.S.C. § 1915(b) lists a child's "reasonable proximity to his or her home" as a priority for pre-adoptive or foster placement.[13]

■ 11. Although the superior court continued the termination trial for ten months to give the parents another chance to make necessary changes, in the intervening period Roy stopped taking drug tests and did not inform OCS of his living arrangements, and Sheila ceased attending drug treatment and left the state more than once without OCS's knowledge. The superior court did nor err in finding that Roy and Sheila did not make "the long-term changes that would be necessary to successfully parent" Jade. Roy cites the State's expert witness's acknowledgment of Jade's bond to her biological family. But Dr. Jones's testimony in full indicates that Jade was more strongly bonded to her foster family than her biological family. Roy also argues there was insufficient evidence of harm caused to Jade. But the superior court did not err in finding, based upon Dr. Jones's testimony, that the parents' prolonged absence from Jade's life has itself caused harm. The superior court considered the factors listed in AS 47.10.088(b) and did not err in finding that a preponderance of the evidence supported termination.[14]

■ 12. Roy also appeals the superior court's finding that there was good cause to deviate from the ICWA placement preferences. We have recognized "the importance of early placement decisions that are compliant with ICWA."[15] And CINA Rule 10.1(b) requires the superior court, at each hearing authorizing an Indian child's removal from her parent, to review "whether [OCS] has complied with the placement requirements of 25 U.S.C. § 1915(b)." In this case, OCS's efforts to facilitate the placement process with Jade's paternal grandmother, Donna,

9. *See id.* (" '[I]ncarceration is a significant factor' that ... ['']affects the scope of the active efforts that the [s]tate must make.' ") (quoting *A.A.,* 982 P.2d at 261–62).

10. *Lucy J. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.,* 244 P.3d 1099, 1120 (Alaska 2010) (quoting *Jacob W. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.,* Mem. Op. & J. No. 1319, 2008 WL 5101809, at *9 (Alaska, Dec. 3, 2008)).

11. *See David S. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.,* 270 P.3d 767, 779–81 (Alaska 2012).

12. *Id.* at 779.

13. We decline to adopt Roy's interpretation of the statute, advanced at oral argument, that "reasonable proximity" refers to something other than geographic proximity.

14. *See Dashiell R. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.,* 222 P.3d 841, 850–51 (Alaska 2009) (affirming superior court's decision to terminate parental rights because children needed "a permanent, stable relationship" and "a home where they have an ongoing sense of permanence and security").

15. *David S.,* 270 P.3d at 780.

and her cousin, Delia, were distracted and inefficient at best. An OCS social worker failed to contact Donna after being told that she was a potential placement for Jade. Another social worker closed the pending ICPC request for Donna without following up with Illinois to find out why the process had become delayed. The social worker did not reopen the request for weeks after learning that its closure was due to an error. OCS also waited for at least two months to submit a home study request for Delia, without explaining the delay. The fact that this case was transferred between four different social workers over the course of two years is no excuse for OCS to lose track of its responsibility to investigate potential ICWA–compliant placements.

13. We have explained that placement decisions in CINA cases are "final for purposes of appellate review" when they leave "nothing further for the court to do with respect to" the placement question.[16] That certain issues in a CINA case are still pending does not "destroy[] the finality, and therefore the appealability, of other issues."[17] Here—as outlined above—the superior court approved the decision to place Jade with the Mackenzies three times between August 2009 and the commencement of the second phase of the continued termination trial in March 2011. Because "absent a change in the placement plan ... the placement goals for [Jade] would not change" after at least some of those rulings, the parties could have appealed the decision much earlier in the process.[18] However, the parties did not object to or seek appellate review of any of these rulings. In addition, until late in the process, no party raised the question with the trial court whether OCS was following CINA Rule 10.1(b)(2)'s requirement that OCS "comply with 25 U.S.C. § ... 1915(b) within a reasonable time."[19]

14. By the end of the termination trial, the State's expert witness, Dr. Jones, testified that Jade was very fully bonded with and "embedded" in her foster family, and losing contact with them would be "a very significant loss" for Jade. Jade has been sent to five separate placements throughout the pendency of this case. Dr. Jones found that if Jade were to be moved from the Mackenzie family, with whom she had bonded, she would likely form a new attachment only "cautiously ... because of the previous experiences of loss she's had." It was Dr. Jones's opinion that it would take Jade from two to five years to bond with another caregiver. The superior court relied upon that evidence in finding good cause to deviate from the ICWA placement preferences and keep Jade in the Mackenzie home.

15. We have affirmed decisions to deviate from the ICWA placement preferences based on findings that "another separation is certain to cause serious emotional harm and would create a significant likelihood that [the child's] ability to attach would be irrevocably destroyed."[20] We have also held that "the best interests of the child are ... paramount in making pre-adoptive placement determinations under ICWA" and a "superior court did not err by ... primarily stressing [the child's] best interests."[21] In this case, Jade was four when she was first moved to her current foster home after living in four separate placements, and she has lived there ever since. She was six at the close of the termination trial. In finding good cause to deviate from ICWA's placement preferences, the su-

---

**16.** *S.S.M. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.*, 3 P.3d 342, 345 (Alaska 2000).

**17.** *Id.*

**18.** *Id.*

**19.** We emphasize that the parents' failure to appeal the earlier placement decisions does not legitimize or minimize the serious concerns raised by OCS's failure to adequately investigate placements with Donna in Illinois and with Delia in Alakanuk.

**20.** *L.G. v. State, Dep't of Health & Soc. Servs.*, 14 P.3d 946, 955 (Alaska 2000); *see also In re Adoption of F.H.*, 851 P.2d 1361, 1365 (Alaska 1993) (where "an early interventionist stated that [the child's] bond with [the foster parent] is the best she will ever have," that bond was "a proper factor for the superior court to consider").

**21.** *C.L. v. P.C.S.*, 17 P.3d 769, 776 & n. 30 (Alaska 2001) (citing *L.G.*, 14 P.3d at 955).

perior court did not err in relying on Dr. Jones's concerns that Jade would be damaged emotionally if her strong bond to the Mackenzies was broken.

16. Finally, Roy argues that the superior court abused its discretion by allowing Jade's adoptive parents to have excessive control over the biological parents' post-termination visitation with Jade. Here, the superior court noted expert testimony that Jade would benefit from visitation as long as it was "appropriate and emotionally healthy." The superior court therefore ordered Jade's adoptive parents to follow her "counselor's recommendations regarding future contact with the parents." Roy has not shown that this order is an abuse of discretion.

17. We therefore AFFIRM the superior court's rulings on termination and placement, and we AFFIRM its order providing for post-termination visitation.