**DAVID S., Appellant,**

v.

**STATE of Alaska, DEPARTMENT OF HEALTH & SOCIAL SERVICES, Office of Children's Services, Appellee.**

**Nos. S–13874, S–14208.**

Supreme Court of Alaska.

Jan. 20, 2012.

---

Nancy Driscoll Stroup, The Law Office of Nancy Driscoll Stroup, Palmer, for Appellant.

Megan R. Webb, Assistant Attorney General, Anchorage, and John J. Burns, Attorney General, Juneau, for Appellee. Dianne Olsen, Law Office of Dianne Olsen, Anchorage, for Guardian ad Litem.

Before: CARPENETI, Chief Justice, FABE, WINFREE, CHRISTEN, and STOWERS, Justices.

*OPINION ON REHEARING*

FABE, Justice.

## I. INTRODUCTION

David appeals the termination of his parental rights to his daughter Hannah, an Indian child.[1] Hannah was taken into the custody of the Office of Children's Services (OCS) while David was incarcerated. David remained in jail for the first 20 months of Hannah's life. David was released from prison and was on parole for five months, during which time he had regular visits with Hannah. David then became a fugitive for nine months, before being recaptured and reincarcerated. While David was a fugitive, OCS petitioned for termination of his parental rights, and two months after David was returned to prison, the superior court held a termination trial. The superior court found that Hannah was a child in need of aid due to David's abandonment, incarceration, and substance abuse. The superior court also concluded that OCS had engaged in active efforts to help David's rehabilitation, as required by the Indian Child Welfare Act, and that it was in Hannah's best interests for David's parental rights to be terminated. David appeals, and we affirm the superior court's ruling because OCS established all requirements necessary for termination.

David also appeals the denial of his post-judgment Alaska Civil Rule 60(b)(6) motion to set aside the judgment due to ineffective assistance of counsel. He argues that his attorney was overly "passive" during trial and did not adequately pursue David's goal of placing Hannah with his mother, Claire. Because David did not overcome the presumption that his attorney was competent, and because the complained-of conduct did not affect the outcome of David's trial, we affirm the superior court's denial of David's 60(b)(6) motion.

## II. FACTS AND PROCEEDINGS

Before he turned 18, David had multiple encounters with the juvenile justice system.[2] After he turned 18, his criminal troubles continued. Between 2002 and 2004, he was convicted of a series of offenses, including driving offenses and forgery. David was imprisoned and released on October 31, 2005. Upon his release, he moved in with his mother, Claire, in Juneau.

In May 2006 David reported to his probation officer that his girlfriend, Diane, was pregnant. Diane is a member of the Tlingit and Haida tribe; David has reported that he is part-Native but is not an official member of any tribe. In August 2006 David was arrested for failing to report to his probation officer during the previous month. At the time of his arrest, David was in possession of methamphetamine, but he was released and given a court date of August 26. David failed to appear for that court date. David was arrested again on September 24, 2006, when police responded to a report of domestic violence between him and Diane.

David and Diane's daughter, Hannah, was born in November 2006. Just over two weeks after her birth, police responded to a report of domestic violence between David and Diane. David was detained, and a urine

---

1. We use pseudonyms to protect the privacy of those involved.

2. The record does not detail the exact number or nature of these encounters. Marylee Cassell-Quinto, an employee of the Department of Corrections, testified that David had "about" ten charges in his juvenile history. But Cassell-Quinto acknowledged that she did "not know the juvenile system well enough" to comment exactly.

analysis test documented marijuana and methamphetamine in his system. A court date was set for November 28, 2006, but David failed to appear. He was arrested at his residence on November 30, 2006, and on December 6 was charged with possession of methamphetamine. Around that time, David was also charged with failure to appear. He was sentenced to four years of imprisonment with two years suspended on the possession offense and six months of imprisonment on the failure to appear charge.

## A. 2006–2008 Imprisonment And Initial OCS Contact

David was imprisoned from November 30, 2006 until August 7, 2008. Although he participated in RSAT, a substance abuse treatment program, while incarcerated, he was written up twice for "incidents of using drugs."

OCS assumed custody of Hannah and her half-brother Kevin, Diane's son by another father, on April 4, 2008, while David was still incarcerated. OCS had investigated the children's situation on suspicion of "substance abuse and neglect." Late at night on March 31, 2008, Diane called OCS, explaining that she had been kicked out of her sister's house, and arranged for OCS to take "emergency custody."

OCS spoke to the correctional facility holding David on April 28, 2008 to set up phone visitation. There were a total of eight phone visits between David and Hannah during David's imprisonment. At this time, Hannah was "not verbal" and the phone visits consisted of David speaking to Hannah, telling Hannah that he loved her, and asking how she was doing.

OCS adopted a case plan on April 18, 2008. David signed this plan. The superior court held an adjudication hearing on June 19, 2008, during which David stipulated that Hannah was in need of aid, and the superior court committed Hannah to OCS custody on June 23. A case review was held on June 25. David was contacted in case he wished to attend the review telephonically, but he did not request to do this.

The OCS caseworker, Heather Karpstein, spoke to David at Wildwood Correctional Center on July 17, 2008. David stated that he felt that Diane was incapable of caring for the children, and that he wanted to "write off [Diane]" once he was released from prison. But David acknowledged that "he and [Diane] are very dependent on each other." Karpstein asked if David wanted to speak to Karpstein again by phone before he was released, but David declined.

## B. August 2008 Release And OCS Meetings

On August 7, 2008, David was released to his sister's residence. David visited with the children for one hour on August 12, and OCS reported that the visit went well. Later that day, Karpstein met with David at OCS offices. Karpstein collected biographical information on David, and David discussed his drug use. Karpstein scheduled monthly checkup meetings with David and talked about the possibility of updating the case plan to include weekly visitation with the children and drug screenings. A new plan was not actually adopted, but Karpstein testified that "[David] and I did speak about what needed to be done." OCS scheduled two hour-long visits per week with Hannah. David largely attended these visits, making it to 28 of the 33 visits offered him. On August 21, 2008, Karpstein drafted a letter in support of David's attempt to secure housing. David was nevertheless unable to obtain independent housing and continued to live with his sister Violet. In September 2008 Karpstein contacted a Tlingit and Haida official to see if David could attend one of their classes on families, but David was unable to attend due to work. He was employed as a cook at a university cafeteria.

David was present at the September 18 case review, held six months after OCS custody began. After the meeting ended, Karpstein spoke with David about his parenting issues. OCS personnel told David that three months later they would be holding a planning conference to discuss whether the goal should remain reunification or whether it should be changed to termination.

Karpstein next met with David on October 6, 2008 and discussed David's inability to obtain independent housing. David stated that he was attending narcotics anonymous classes, and Karpstein gave him a sheet to have signed to prove his attendance at these meetings.

On November 3, 2008, David tested positive for methamphetamine on a urine analysis test administered as part of his parole supervision. David confessed to having used methamphetamine but was not remanded to prison. Instead, a curfew was imposed, and David was subjected to more frequent urine analysis tests. OCS paid for a substance abuse assessment at Rainforest Recovery Center.

Karpstein attempted to call David on November 19, 2008 about setting up another meeting, but was unable to reach him until November 24. They set up a meeting for November 28, 2008, at which David admitted to relapsing. He also stated that he had been fired from his job. He claimed that he was attending NA meetings but did not produce the attendance sheet Karpstein had given him. Karpstein and David scheduled another meeting for December 19, 2008. David did not show up for that meeting.

In December 2008 David reported to his parole officer that Diane was pregnant, and on December 16 David told his parole officer that Diane needed to travel out of town and asked for permission to go with her.[3] This permission was denied, but David nevertheless accompanied Diane on her travel. On December 22 Karpstein encountered David at the Juneau airport. She observed David and Diane exiting a plane that had originated in Seattle and had stopped in Sitka and Ketchikan. She did not attempt to speak to David, but observed him and Diane board a plane bound for Anchorage.

### C. Fugitive Status From January 2009 To September 2009

Karpstein attempted to call David on January 6 but his phone had been disconnected. David began to miss reports to his parole officer and did not report a change of address. As a consequence, David was remanded to prison on January 8, 2009. On January 21 he was released to a halfway house. He remained at the halfway house "[n]o longer than three hours" before fleeing.

OCS scheduled a case review for February 3, 2009, but neither parent showed up, and it was rescheduled for February 13. David did not attend this meeting either. At the meeting, OCS changed the permanency goal from reunification to adoption. A new case plan was generated on March 19, 2009. OCS filed a termination petition on April 7, 2009.

David was next seen in March 2009 in Juneau. An employee at Fred Meyer recognized David, called the police, and gave them the license number of the Ford Explorer David had left in. A police officer went to Diane's residence and found the vehicle there. There were two males in the vehicle. On the officer's request, the driver identified himself as "Sean Maroney" but told the officer he did not have any identification. The officer asked the driver to step out of the vehicle, but the driver put the car into gear and drove off. The officer ran back to his vehicle, began pursuit, but almost immediately saw that the Explorer had stopped and that the driver was fleeing down the street. The officer initially pursued the driver, but because other units were arriving on the scene, the officer returned to secure the vehicle. Using Department of Corrections photos, the officer later identified the driver as David.

Upon returning to the Ford Explorer, the officer saw the passenger walking away from the vehicle carrying a black bag. The officer pulled up behind the passenger, and the passenger threw the bag into a pile of snow where the officer retrieved it.

The police began to search the vehicle and, after finding drug paraphernalia, obtained a search warrant. The bag was searched and found to contain methamphetamine and drug paraphernalia. The bag also contained a photo album which had pictures of David.

3. The record does not confirm whether Diane was in fact pregnant, and the record does not discuss any resulting children.

Police searched the Ford Explorer and found six cell phones and a digital scale "commonly used in drug activity."

David called Karpstein on April 6, 2009 and left a voicemail, providing a phone number and requesting that she call him back. Karpstein alerted the police because she knew that David was a fugitive. While the police were present, Karpstein called the number. David answered but hung up when Karpstein revealed who she was.

OCS held a case review on August 24, 2009. This was a regularly scheduled case review, held six months after the previous review in February.

### D. Arrest In Petersburg In September 2009

In September 2009 Petersburg police arrested David for stealing pallets from a local cannery. David initially fled from the police and, when later confronted, identified himself as "Travis Collins." He was eventually arrested in his trailer where he admitted to his identity and to stealing the pallets. The officer searched the trailer and discovered "a small marijuana grow, 10 plants or so, in his bathroom." David was returned to prison and remained in state custody through the termination trial. Exactly when he was released is unclear, but apparently David was living and working in Anchorage in November 2010.

### E. Resumed OCS Contact After September 2009 Recapture

On October 1, 2009, Karpstein contacted David at the Petersburg jail. David said that "he had nothing to say to [her] and that if [she] had any questions, [she] needed to speak with his lawyer." Two weeks later, Karpstein requested phone visitation with Hannah for David, and his first phone visit with Hannah was on October 23. Two more phone visits took place, one on October 30 and one on November 6, before the superior court trial began on November 9, 2009.

Karpstein met with David at the Lemon Creek Correctional Center in Juneau on October 26, 2009. At the meeting Karpstein and David discussed Hannah's development.

On November 4, 2009, Karpstein again spoke with David, and David explained that he was involved with "some classes and some groups at Lemon Creek," a correctional facility. Karpstein asked if David would be willing to sign an updated case plan. David agreed and returned a completed signature page. Though a termination petition had been filed and the trial was to begin shortly, the case plan provided recommendations for David to "[m]anage mental health and/or use of substances."

### F. Termination Trial

In April 2009 OCS filed a petition for termination. Since David's location was unknown at that time, OCS received permission for service by publication. OCS also mailed David's mother, Claire, a letter asking her to pass this information along to David if she had contact with him. In July 2009 Diane agreed to relinquish her parental rights to Hannah. The trial was held on November 9 and 13, 2009. At the trial, several parties testified: Juneau and Petersburg police, Department of Corrections personnel, social workers, OCS employees, Violet, and David. The superior court ordered termination of David's parental rights on April 9, 2010.

### G. Hannah's Foster Custody April 2008 To 2010

Since being taken into OCS custody in April 2008, Hannah and her half-brother Kevin have been in four foster placements. In April 2008 they occupied their first foster home, but when those foster parents moved away, Hannah and Kevin were moved to a new foster placement with the Weavers, which lasted from April 25, 2008 until June 2009. In June 2009 OCS placed Hannah and Kevin with their maternal grandfather and his wife. In October 2009, shortly before David's parental rights were terminated, David's mother, Claire, filed a motion seeking placement with her. The record does not detail what happened to this motion, but presumably it was denied because David's parental rights were terminated and custody with the maternal grandparents continued. In January 2010 Claire sought visitation with Hannah, and the grandparents agreed to lim-

ited telephonic and in-person visitation. In May 2010, six months after David's parental rights were terminated, OCS removed Hannah and Kevin from the grandparents and placed them once more with the Weavers. The record does not reveal the reasons for this change, with OCS indicating only that the placement was "disrupted."

Hannah has an individual education plan with her school district, and she has been classified as having several special needs. She has been diagnosed as having "fetal alcohol effects" though she "does not have the full FASD." At the time of the termination trial she received "speech and language therapy" and "occupational therapy."

### H. October 2010 Placement Hearing

On June 2, 2010, after Hannah was removed from her grandparents' home, Claire requested that the superior court schedule a hearing on her request to have the children placed with her. The superior court held a hearing on this motion over four days in October and November 2010. Claire argued that she was an "Indian custodian" under ICWA and therefore entitled to appointed counsel. The superior court ruled that she was not. The court also ruled against placing Hannah with Claire. The court acknowledged that ICWA preferred placement with relatives over unrelated foster parents but found that keeping Hannah with the Weavers was in her "best interests."

### I. Ineffective Assistance Of Counsel

On November 26, 2010, David, now represented by attorney Nancy Stroup, filed a motion under Alaska Civil Rule 60(b)(6) to set aside the judgment terminating his parental rights. David argued that he "was afforded ineffective assistance of counsel at both the [June 19, 2008] Adjudication hearing and the Termination trial." The superior court held an evidentiary hearing on this motion over four days in January and February 2011. The superior court denied David's motion on April 14, 2011.

### III. STANDARD OF REVIEW

We review the factual findings supporting the termination of a parent's right to raise his children for clear error.[4] We will find clear error only when a review of the entire record leaves us "with a definite and firm conviction that the superior court has made a mistake."[5] Whether the trial court's findings satisfy the requirements of the child in need of aid statutes and rules is a question of law which we review de novo.[6] We will not consider issues on appeal that were not raised below absent plain error, which exists "where an obvious mistake has been made which creates a high likelihood that injustice has resulted."[7] We review ICWA's "active efforts" requirement as a mixed question of law and fact.[8]

"Motions for relief from judgment under Civil Rule 60(b) are committed to the sound discretion of the trial court; we will reverse the trial court's decision only for an abuse of discretion."[9]

### IV. DISCUSSION

In order to terminate parental rights under AS 47.10.088 a trial court must find by clear and convincing evidence that (1) a child is in need of aid under one of the bases set forth in AS 47.10.011; (2) the parent has failed to remedy the conduct or conditions underlying the original harm or that returning the child to the parent would place the child at substantial risk of physical or mental injury; and, because the Indian Child Welfare Act applies, (3) OCS made active

4. *S.H. v. State, Dep't of Health & Social Servs., Div. of Family & Youth Servs.*, 42 P.3d 1119, 1122 (Alaska 2002) (citing *M.W. v. State, Dep't of Health & Soc. Servs.*, 20 P.3d 1141, 1143 (Alaska 2001)).

5. *Id.* (citing *M.W.*, 20 P.3d at 1143).

6. *Id.* at 1122–23 (citing *M.W.*, 20 P.3d at 1143).

7. *D.J. v. P.C.*, 36 P.3d 663, 667–68 (Alaska 2001) (quoting *Sosa v. State*, 4 P.3d 951, 953 (Alaska 2000)).

8. *Ben M. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 204 P.3d 1013, 1018 (Alaska 2009), *as amended on reh'g* (Apr. 21, 2009).

9. *Ghete v. Anchorage*, 948 P.2d 973, 975 (Alaska 1997).

efforts to help the parent remedy the problematic behavior or conditions and those efforts were unsuccessful.[10] The court must also find that termination is in the child's best interests.[11] Finally, the court must find, by evidence beyond a reasonable doubt, supported by expert testimony, that an Indian child is likely to suffer serious emotional or physical damage if returned to the parent's custody.[12]

## A. The Superior Court Did Not Err In Finding That Hannah Was A Child In Need Of Aid.

When Hannah was taken into OCS custody in April 2008, David stipulated that she was in need of aid. Alaska Statute 47.10.011 provides that the trial court may find a child to be a child in need of aid if it finds that the child has been subjected to any of 12 conditions. At the termination trial the superior court determined that Hannah was a child in need of aid under three provisions of AS 47.10.011:(1) (abandonment); (2) (incarceration); and (10) (substance abuse). David challenges all three of the superior court's determinations.

### 1. Abandonment

■ The superior court determined that David had abandoned Hannah within the meaning of AS 47.10.011(1). Alaska Statute 47.10.011(1) provides that "a parent or guardian has abandoned the child as described in AS 47.10.013, and the other parent is absent or has committed conduct or created conditions that cause the child to be a child in need of aid under this chapter."

The superior court found that David's incarceration for 20 months just weeks after Hannah's birth rendered him "essentially a stranger to her." The superior court determined that during the time that David lived in Juneau after being released from prison, from August 2008 to January 2009, he "did

not take full advantage of the opportunity to establish a relationship with his daughter." The superior court explained that from January 2009 until September 2009, when David was a fugitive, he "abandoned his daughter by failing to take advantage of the visitation offered by OCS." The superior court did not address David's behavior since his recapture in September 2009, but the court found that David's actions had "resulted in the destruction of the relationship" between David and Hannah.

David argues that he did not abandon his daughter within the meaning of AS 47.10.011(1). He argues that he participated in visits in the form available to him. He points to his regular telephone visits when he was incarcerated from November 2006 until August 2008. He also notes that, upon his release, he was able to attend 28 of the 33 in-person visits offered him. David was a fugitive from January to September 2009. After his recapture, David argues that he "took advantage of all telephone visits that were offered by OCS."

■ We have "articulated a two-part test for reviewing cases of abandonment: '(1) there must be parental conduct evidencing a willful disregard for parental obligations, leading to (2) the destruction of the parent-child relationship.' "[13] We apply "an objective test 'to see if actions demonstrate a willful disregard of parental responsibility.' "[14]

■ To counter the first prong, the parent must "show 'continuing interest in the child and [make] a genuine effort to maintain communication and association.' "[15] The record details several distinct periods of David's relationship with Hannah. Hannah was born in November 2006, and David was incarcerated from November 2006 until August 2008. Hannah was taken into OCS custody four months before David's release. After David

---

10. 25 U.S.C. § 1912(d) (2006).

11. AS 47.10.088(c); CINA Rule 18(c)(3).

12. 25 U.S.C. § 1912(f) (2006).

13. *Sean B. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.,* 251 P.3d 330, 335 (Alaska 2011) (quoting *Rick P. v. State, Office of*

*Children's Servs.,* 109 P.3d 950, 957 (Alaska 2005)).

14. *Id.* at 335–36 (quoting *Jeff A.C., Jr. v. State,* 117 P.3d 697, 704 (Alaska 2005)).

15. *Id.* (quoting *Jeff A.C.,* 117 P.3d at 704).

was released, he was on parole for five months, but when he violated terms of his parole, David was remanded to state custody for two weeks and was then a fugitive for eight months until September 2009, when he was recaptured.

David was remanded to prison in January 2009 and became a fugitive later that month. David asserts that he "did visit with Hannah ... without OCS' knowledge" while he was a fugitive. The record, though, contains no support for this assertion, and the assertion is implausible since during most of that time (January to June) Hannah was in the custody of foster parents unrelated to David. David also claims that while he was a fugitive "he had justifiable cause to not visit Hannah under the auspices of OCS because Heather Karpstein told him he would not be allowed to visit his daughter as long as he was in a relationship with her mother." But there is no record support for the claim that David was told that he would not be allowed to visit Hannah if David continued his relationship with Diane. After David was recaptured, he had three telephonic visits with Hannah before the superior court trial began on November 9.

As for the second prong of the abandonment test, the superior court ruled that David's abandonment, specifically his lack of contact while a fugitive, had "resulted in the destruction of the relationship [David] was trying to develop in the fall of 2008. There is no father-daughter relationship between [David] and [Hannah]."

The cases in which we have affirmed superior court findings of abandonment have usually involved extended periods of no contact between the parent and child.[16] In this case, while David may have had a relationship with his daughter before he absconded, Hannah was just over two years old when David

disappeared for eight months. His absence was nearly a third of her life up to that point. Although David claims he had contact with his daughter during this period, there is no evidence in the record that supports his claim. Such an extended absence so early in Hannah's life supports the superior court's finding that David had destroyed whatever parent-child relationship existed before his departure. We therefore affirm the superior court's finding that Hannah was a child in need of aid under AS 47.10.011(1).

## 2. Incarceration

In two decisions, *Nada A. v. State*[17] and *A.M. v. State*,[18] we concluded "that courts could not rely on the fact of a party's incarceration alone to prove abandonment because it was not the type of willful act upon which abandonment may be based."[19] In response to these decisions, the legislature enacted legislation intended to overrule that holding.[20] This legislation included AS 47.10.011(2), which provides that a parent's incarceration can be a basis for finding a child to be in need of aid if "the other parent is absent or has committed conduct or created conditions that cause the child to be a child in need of aid under this chapter, and the incarcerated parent has not made adequate arrangements for the child."

David argues that he "did make arrangements for Hannah's care while he was incarcerated by giving his mother a power of attorney over his legal affairs and his children's needs." However, David did not produce this power of attorney at his termination trial. Further, during David's incarceration Claire never actually had custody of the children. They instead remained with Diane until she arranged for OCS to take custody, at which point they went into foster placements. David points to a letter

**16.** See *P.M. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.*, 42 P.3d 1127, 1134 (Alaska 2002) (six years); *C.W. v. State, Dep't of Health & Soc. Servs.*, 23 P.3d 52, 56 (Alaska 2001) (three years); *In the Matter of H.C.*, 956 P.2d 477, 482 (Alaska 1998) (over one year).

**17.** 660 P.2d 436 (Alaska 1983).

**18.** 891 P.2d 815 (Alaska 1995).

**19.** *Zander P. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, Mem. Op. & J. No. 1290, 2007 WL 2745157, *3 (Alaska, Sept. 19, 2007).

**20.** Ch. 99, § 1(b)(2)(B) (stating the purpose of the act is to "override the court decisions in" *A.M., Nada A.*, and others), § 18 (amending AS 47.10.011), SLA 1998.

that his mother sent to OCS on September 6, 2009, in which she stated that she wished to have custody of Hannah. The superior court did not discuss the possibility of David's mother caring for Hannah in its termination ruling. Although while he was incarcerated David contacted OCS several times about Hannah before OCS took custody of the child, there does not appear to be any evidence that he attempted to place her with Claire. We therefore affirm the superior court's finding that Hannah was a child in need of aid under AS 47.10.011(2).

### 3. Substance abuse

■ The superior court found that David "has a polysubstance abuse addiction" that rendered Hannah a child in need of aid under AS 47.10.011(10). Alaska Statute 47.10.011(10) provides that a child is in need of aid if "the parent, guardian, or custodian's ability to parent has been substantially impaired by the addictive or habitual use of an intoxicant, and the addictive or habitual use of the intoxicant has resulted in a substantial risk of harm to the child."

David argues that he "has received extensive treatment for his substance abuse problem" and there was no evidence presented at trial that David used methamphetamine after October 2008. There was, however, evidence that David was still using illegal drugs at the time of his arrest in September 2009. When David was arrested, he was growing marijuana in his trailer, and he admitted to smoking marijuana. And at the time of David's near capture in March 2009, he was seen driving a vehicle that contained a bag that was later discovered to contain methamphetamine and drug paraphernalia.

The State points to testimony by a social worker describing how drug use, and methamphetamine use in particular, can be harmful to children. The social worker explained that using methamphetamine can compromise an individual's ability to care for a child. In *Stanley B. v. State*, we explained that the "substantial harm" requirement was satisfied if a parent's addictions are "at least partially

responsible for his current and past incarcerations, and . . . his frequent and prolonged absences while incarcerated substantially impair his ability to parent." [21] Because David's incarceration was "at least partially" related to drugs, this provision is satisfied. We therefore affirm the superior court's finding that Hannah was a child in need of aid under AS 47.10.011(10).

### B. The Superior Court Did Not Err In Finding That David Failed To Remedy The Conditions That Placed Hannah In Need Of Aid.

■ Alaska Statute 47.10.088(a)(2) provides that before parental rights can be terminated, the superior court must find that the parent

(A) has not remedied the conduct or conditions in the home that place the child at substantial risk of harm; or

(B) has failed, within a reasonable time, to remedy the conduct or conditions in the home that place the child in substantial risk so that returning the child to the parent would place the child at substantial risk of physical or mental injury. . . .

David argues that he has made efforts in the three areas discussed above (abandonment, incarceration, and substance abuse). However, there is no evidence that any of these behaviors has ceased or was only confined to the past. David was a fugitive until shortly before the termination trial, was arrested for drug-related crimes, and then was incarcerated during the termination trial.

### C. The Superior Court Did Not Err In Concluding That The Active Efforts Requirement Had Been Met.

■ The Indian Child Welfare Act provides that "[a]ny party seeking to effect a foster care placement of, or termination of parental rights to, an Indian child under State law shall satisfy the court that active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful." [22] In describing what constitutes "active efforts," we have said:

---

**21.** 93 P.3d 403, 407 (Alaska 2004).

**22.** 25 U.S.C. § 1912(d) (2006). The ICWA requirements apply even when OCS is seeking to

Passive efforts are where a plan is drawn up and the client must develop his or her own resources towards bringing it to fruition. Active efforts, the intent of the drafters of the Act, [occur] where the state caseworker takes the client through the steps of the plan rather than requiring that the plan be performed on its own.[23]

The superior court found that the active efforts requirements had been met, listing these efforts as including "substance abuse treatment and case management services provided by both the Department of Corrections and OCS, as well as OCS's efforts to assist with housing, to coordinate its efforts with DOC, and to provide [David] with opportunities to visit [Hannah]."

David argues that OCS failed to satisfy the active efforts requirement in two ways. First, he argues that after he was recaptured in 2009 OCS "offered only three telephone visits" and "made no attempt to facilitate in-person visitation." David was recaptured in September 2009 after being a fugitive for nine months and his termination trial began in November 2009. Responding to David, OCS points to the services it offered during that period. David was arrested on September 28, and Karpstein contacted him on October 1. David told Karpstein that he did not wish to speak with her. Karpstein later arranged three phone visits with Hannah, on October 30, November 6, and November 9, before the termination trial began. Karpstein met with David in person on October 26 and spoke with him by phone on November 5. David does not specify what other services he thinks OCS should have provided. We have previously found that telephonic visits with an incarcerated parent satisfied the active efforts requirement.[24] And we have explained that a parent's "demonstrated lack of willingness to participate in treatment may be considered in determining whether the state has taken active efforts." [25] David's refusal to speak with Karpstein on October 1 undermines his argument that OCS should have arranged more than three visits between October 1 and the beginning of the termination trial in November.

Second, David argues that "OCS failed to meet its active efforts burden because it did not comply with ICWA's placement preferences." [26] Because David did not advance this argument at trial, we review it only for plain error.[27] Plain error exists "where an obvious mistake has been made which creates a high likelihood that injustice has resulted." [28]

We have never directly decided the question whether OCS's failure to follow ICWA's placement preferences can provide a basis for deciding that OCS has failed to undertake active efforts. Section 1915 of ICWA provides:

> In any foster care or preadoptive placement, a preference shall be given, in the absence of good cause to the contrary, to a placement with—
>
> (i) a member of the Indian child's extended family;
>
> (ii) a foster home licensed, approved, or specified by the Indian child's tribe;
>
> (iii) an Indian foster home licensed or approved by an authorized non-Indian licensing authority; or
>
> (iv) an institution for children approved by an Indian tribe or operated by an Indian organization which has a program

terminate the parental rights of a non-Indian parent. *K.N. v. State*, 856 P.2d 468, 474 n. 8 (Alaska 1993).

23. *A.A. v. State, Dep't of Family & Youth Servs.*, 982 P.2d 256, 261 (Alaska 1999) (quoting CRAIG J. DORSAY, THE INDIAN CHILD WELFARE ACT AND LAWS AFFECTING INDIAN JUVENILES MANUAL 157–58 (1984)).

24. *Dashiell R. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 222 P.3d 841, 844, 850 (Alaska 2009).

25. *Maisy W. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 175 P.3d 1263, 1268 (Alaska 2008) (quoting *N.A. v. State, Div. of*

*Family & Youth Servs.*, 19 P.3d 597, 603 (Alaska 2001)).

26. David also incorporates his argument about placement into his ineffective assistance of counsel claim, arguing that his attorney's failure to raise this argument was part of his ineffective assistance.

27. *D.J. v. P.C.*, 36 P.3d 663 (Alaska 2001).

28. *Id.* at 667–68 (quoting *Sosa v. State*, 4 P.3d 951, 953 (Alaska 2000)).

suitable to meet the Indian child's needs.[29]

CINA Rule 10.1(b) requires that at

each hearing at which the court is authorizing an Indian child's removal from the child's parent or Indian custodian or continuing a previous order authorizing removal, the court shall inquire into and determine:

(A) whether the Department has complied with the placement requirements of 25 U.S.C. § 1915(b) and

(B) whether active efforts have been made to provide remedial services and rehabilitative programs as required by 25 U.S.C. § 1912(d).

David argues that OCS's placement decision did not conform to ICWA's placement preferences and that this failure means that OCS did not meet its burden of taking active efforts. We disagree.

We recognize the possibility that cases may exist in which OCS's early placement decisions may directly impact the ability of parents to fulfill the requirements of their case plans and thus may be part of OCS's active efforts "designed to prevent the break up of the Indian family." Resolving the question whether OCS has met its burden of making active efforts to provide remedial services and rehabilitative programs in a particular case requires a fact-intensive inquiry. For example, we have concluded that items as basic as helping a mother acquire a bus pass and day care are relevant to the active efforts analysis,[30] for in a particular case, the lack of a bus pass or day care assistance could impede a parent's ability to access remedial services. Similarly, a child's placement might affect a parent's ability to participate in remedial efforts. But ordinarily the question whether a placement decision complies with ICWA's placement preferences will not be germane to the elements of termination because nothing in ICWA requires a consideration of the ICWA placement preferences in the decision whether to terminate parental rights.[31]

■ The statutory scheme of ICWA supports this interpretation. Section 1914 of ICWA provides that any Indian child, parent, Indian custodian, or Indian child's tribe may challenge a termination of parental rights or foster care placement "upon a showing that such action violated any provision of sections 1911, 1912, and 1913" of ICWA.[32] The active efforts requirement falls under § 1912. Placement preferences, however, are under § 1915, and therefore do not fall within the scope of ICWA's remedial provision. Under ICWA, then, a termination of parental rights may not be invalidated by showing a violation of the ICWA placement preferences. Other courts that have addressed the question whether a failure to follow placement preferences invalidates termination have generally reached the same conclusion.[33]

29. 25 U.S.C. § 1915(b) (2006).

30. *See Lucy J. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.,* 244 P.3d 1099, 1115 (Alaska 2010).

31. Before a parent of an Indian child may have his or her parental rights terminated, the State must prove: (1) by clear and convincing evidence that the child is in need of aid (CINA Rule 18(c)(1)(A)); (2) by clear and convincing evidence that the parent has not remedied the conditions that placed the child in need of aid (CINA Rule 18(c)(1)(A)(i)–(ii)); (3) "that active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful" (25 U.S.C. § 1912(d) (2006)); (4) "beyond a reasonable doubt, including testimony of qualified expert witnesses, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child" (*Id.* § 1912(f)); and (5) "by a preponderance of the evidence that termination of parental rights is in the best interests of the child[.]" (CINA Rule 18(c)(3)).

32. 25 U.S.C. § 1914 (2006).

33. *See Doe v. Mann,* 285 F.Supp.2d 1229, 1240 (N.D.Cal.2003) (finding that § 1915 did not provide a cause of action for challenging termination decisions); *Navajo Nation v. Superior Court of The State of Wash. for Yakima Cnty.,* 47 F.Supp.2d 1233, 1242–43 (E.D.Wash.1999), *aff'd on other grounds,* 331 F.3d 1041 (9th Cir.2003) (same); *In the Matter of Appeal in Maricopa Cnty. Juvenile Action No. JS–7359,* 159 Ariz. 232, 766 P.2d 105, 108 (App.1988) ("Even if the Indian Child Welfare Act applied and the preferred placements were ignored, this is immaterial to the question whether termination based on a failure to remedy the condition which made the out-of-home placement necessary is appropri-

We reached a similar conclusion in *Jacob W. v. State, Department of Health & Social Services, Office of Children's Services,* an unpublished decision, where a parent argued that ICWA placement preferences ought to be considered in whether termination of parental rights was in a child's best interest.[34] We rejected that argument, observing that "nothing in ICWA requires consideration of placement options in determining whether to terminate parental rights. The relevant issue was whether [the parents'] parental rights should be terminated in the best interests of the children, not what would happen to the children after termination of those parental rights."[35] We subsequently faced the same argument in *Lucy J. v. State, Department of Health & Social Services* and summarily rejected it, quoting *Jacob W.* with approval.[36]

We recognize that active efforts may involve employing available family resources to shape a case plan and assist parents in carrying out that plan. Indeed, the Bureau of Indian Affairs (BIA) has promulgated guidelines that provide that state agencies "shall take into account the prevailing social and cultural conditions and way of life of the Indian child's tribe," and that "[t]hey shall also involve and use the available resources of the extended family, the tribe, Indian social service agencies and individual Indian care givers."[37] But placement decisions present a separate analytical question from termination decisions. There is no support in ICWA for an attempt to graft § 1915's placement preferences onto § 1912.

We recognize the importance of early placement decisions that are compliant with ICWA. To that end, CINA Rule 10.1(b) requires courts to determine "[a]t each hearing at which the court is authorizing an Indian child's removal" from the home whether OCS complied with ICWA placement preferences. But that rule further provides that a failure to follow those preferences "is not in itself a ground for restoring the child to the parent or Indian custodian or dismissing a petition and does not affect the court's ability to proceed to adjudication."[38] And although

ate.'"); *In re Vincent M.,* 2010 WL 2557188, *8 (Cal.App.2010) ("[A]ctive efforts and placement [a]re two separate, distinguishable issues."); *In re A.A.,* 167 Cal.App.4th 1292, 84 Cal.Rptr.3d 841, 863 (2008) ("ICWA and ... California's statutory law address the issue of an Indian child's placement separately from the issue of active efforts. Following their lead, we distinguish the issue of placement from that of active efforts.") (internal citations omitted); *In the Interest of J.W.,* 528 N.W.2d 657, 662 (Iowa App. 1995) ("The remedial provisions of section 1914 do not apply to violations of section 1915"); *B.R.T. v. Exec. Dir. of Soc. Serv. Bd.,* 391 N.W.2d 594, 601 (N.D.1986) ("[I]nvalidation of a parental rights termination may not be accomplished by showing a violation of the placement preferences in a proceeding brought pursuant to [section] 1914."); *State ex rel. Juvenile Dep't of Multnomah Cnty. v. Woodruff,* 108 Or.App. 352, 816 P.2d 623, 625 (1991) ("Failure to comply with the foster care placement preferences in § 1915(b) is not a basis for invalidating a court order terminating parental rights."). *But see In re K.B.,* 173 Cal.App.4th 1275, 93 Cal.Rptr.3d 751, 764–65 (2009) (assuming without deciding that placement could be a part of active efforts, but finding that the state had made active efforts to satisfy ICWA's placement preferences); *In re L.N.W.,* 457 N.W.2d 17, 20 (Iowa App.1990) (same); *In the Matter of Welfare of M.S.S.,* 465 N.W.2d 412, 419 (Minn.App.1991) (finding that the state had not proved active efforts beyond a reasonable doubt because it had not considered placing the child with the father's brother and sister-in-law following an explicit request from the child's father that had been endorsed by the tribe); *but see also In re Welfare of Child of Wilson,* 2003 WL 21266612, at *2 (Minn.App. June 3, 2003) (limiting *M.S.S.* to cases in which the parents make a specific placement request that is endorsed by the child's tribe).

**34.** Mem. Op. & J. No. 1319, 2008 WL 5101809, at *8 (Alaska, Dec. 3, 2008).

**35.** *Id.* at *9.

**36.** *Lucy J. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.,* 244 P.3d 1099, 1120 (Alaska 2010) (quoting *Jacob W.* at *9) ("In an unpublished memorandum opinion, we held that while 'ICWA requires that preference be given—in absence of good cause to the contrary—to members of the child's extended family or to someone otherwise affiliated with the child's Indian tribe.... [T]his specifically applies to placement of an Indian child; nothing in ICWA requires consideration of placement options in determining whether to terminate parental rights.'").

**37.** Guidelines for State Courts; Indian Child Custody Proceedings, 44 Fed.Reg. 67,584, 67,592 (Nov. 26, 1979).

**38.** CINA Rule 10.1(b)(2).

Rule 10.1(b) specifically provides that "the court cannot enter a disposition order if the court finds that the requirements of 25 U.S.C. § 1912(d) (active efforts) have not been met," it does not preclude a termination disposition when there is a failure to follow placement preferences.[39] Accordingly, it was not plain error for the superior court to find that OCS made active efforts.

■ We also note that in this case OCS did comply with ICWA's placement preferences. The record demonstrates that OCS attempted to follow ICWA's placement preferences by exploring placement options with such family members as Claire, the maternal grandparents, and David's sister Violet. In communication with the grandparents, OCS indicated that "OCS would like to transition the children back to family as soon as possible." OCS records include numerous communications with the grandparents about their suitability and availability for placement. Violet, Claire, and the grandparents all at various points indicated that they probably would not be able to take Hannah. OCS eventually selected the grandparents for placement and sent a letter to Claire explaining that decision.

OCS also made considerable efforts to place Hannah with Claire, David's mother and preferred placement. OCS spoke to Claire soon after the children were taken into custody. Claire was then living with her daughter and son-in-law and explained that she also needed to talk to her husband about taking the children. Claire said that she needed to "get back" to OCS, but she never did. Two months later, in June 2008, at a case review, Claire again expressed interest in taking Hannah. She was given "a licensing packet" but did not complete it until "mid–2009." The OCS case worker, Heather Karpstein, had several concerns about Claire as a placement option. Claire had "shown

inconsistency" by setting up "scheduled visitations ... and then cancel[ing] at the last minute." Her housing was also uncertain, as she was "thinking about moving to Point Baker and living on a houseboat." Claire also told Hannah's foster mother that Claire "was planning to let [David] take care of [Hannah] once he was released from incarceration." In an April 2009 meeting with Karpstein, Claire again expressed interest in taking Hannah, but she explained that she was not interested in a "long-term adoptive placement." When Karpstein explained that she was looking for permanent placement, Claire responded that she was "ready to take [Hannah] until mom and dad can get their act together."

Because Claire had never completed the appropriate custody paperwork, among other reasons, OCS elected to place Hannah with the grandparents, Diane's father and stepmother, in June 2009. However, OCS removed Hannah from the grandparents' home in May 2010. In July and August 2010, OCS again explored placement with Claire, contracting for a home study of her home. This study was completed in mid-October. But several concerns resulted in the study not recommending placement with Claire. Among these were the expressed concern that Claire and her husband were unprepared to handle Hannah's special needs and the fear that Claire would return Hannah to Diane's or David's care.

In the *Matter of Adoption of F.H.*, we discussed ICWA's placement requirements and the meaning of ICWA's statement that the preferences are controlling "in the absence of good cause."[40] We noted that ICWA does not define "good cause" but that the BIA has issued guidelines on the meaning of the term.[41] The BIA guidelines expressly state that "they are not published as regulations because they are not intended to

---

**39.** *Id.* As far as remedial provisions for a failure to follow placement preferences, the rule provides that "[o]n motion of a party or on its own motion, the court may order the Department to comply with 25 U.S.C. § ... 1915(b) within a reasonable time. If the Department fails to comply with this order, the court may impose appropriate sanctions." *Id.* But that the rule gives courts discretion to issue orders and impose

sanctions does not in any way suggest that a failure to follow placement preferences invalidates a termination disposition.

**40.** 851 P.2d 1361, 1364 (Alaska 1993).

**41.** *Id.;* Indian Child Custody Proceedings, 44 Fed.Reg. at 67,594.

have binding legislative effect," [42] but as we explained in *F.H.*, we "ha[ve] looked to them for guidance." [43] The BIA guidelines include a provision explaining the meaning of good cause:

> F.3. Good Cause To Modify Preferences
> (a) For purposes of foster care, preadoptive or adoptive placement, a determination of good cause not to follow the order of preference set out above shall be based on one or more of the following considerations:
>> (i) The request of the biological parents or the child when the child is of sufficient age.
>> (ii) The extraordinary physical or emotional needs of the child as established by testimony of a qualified expert witness.
>> (iii) The unavailability of suitable families for placement after a diligent search has been completed for families meeting the preference criteria.
> (b) The burden of establishing the existence of good cause not to follow the order of preferences ... shall be on the party urging that the preferences not be followed.[44]

Section (a)(iii) includes the "unavailability of suitable families" as one example of good cause. Because OCS did explore the availability of "suitable families," this case fits within this "good cause" exception.

### D. The Superior Court Did Not Err In Finding That Hannah Would Likely Suffer Serious Harm If Returned To David's Care.

Under ICWA, the trial court must find, based on "evidence beyond a reasonable doubt, including testimony of qualified expert witnesses, that the continued custody of the child by the parent ... is likely to result in serious emotional or physical damage to the child." [45] We have held that proof may be shown "through expert testimony alone or through aggregating expert testimony with other evidence," including lay witness testimony.[46]

At trial, OCS relied on the expert testimony of two witnesses: Shelly Gomez, an OCS supervisor who was qualified as an expert in social work, and Samantha Abernathy, a licensed clinical social worker and addiction counselor who was qualified as an expert in chemical dependency treatment. The superior court found that David's substance abuse, including his recent history of relapse, demonstrated beyond a reasonable doubt that placing Hannah with her father "would put her at high risk of serious emotional or physical damage." On appeal, David challenges Gomez's qualifications as an expert, but he does not challenge Abernathy's. David argues that Gomez possesses only "normal social worker qualifications," which are insufficient under ICWA to render her an expert.[47] But even were David right that Gomez is not an expert under ICWA,[48] Abernathy's unchallenged expert testimony, combined with evidence of David's continuing substance abuse, support the superior court's finding beyond a reasonable doubt that Hannah was likely to suffer harm if returned to her father's care. We therefore conclude that the superior court did not err in concluding that Hannah would likely suffer serious harm if returned to David.

### E. The Superior Court Did Not Err In Finding That Termination Was In Hannah's Best Interests.

Under AS 47.10.088(c), a court is required to consider the best interests of the

---

42. Indian Child Custody Proceedings, 44 Fed. Reg. at 67,584.

43. 851 P.2d at 1364 (citing *In re L.A.M.*, 727 P.2d 1057, 1060 n. 6 (Alaska 1986)).

44. Indian Child Custody Proceedings, 44 Fed. Reg. at 67,594.

45. 25 U.S.C. § 1912(f) (2006).

46. *Ben M. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 204 P.3d 1013, 1020 (Alaska 2009).

47. *See Marcia V. v. State*, 201 P.3d 496, 504 (Alaska 2009) ("ICWA § 1912(f) heightens the requirements for an expert's qualifications beyond those normally required to qualify an expert.").

48. And given Gomez's high degree of experience and previous qualification as an expert, it seems most unlikely that she would not qualify.

child in making a termination of parental rights determination and CINA Rule 18(c)(3) similarly provides that the court must find by a preponderance of the evidence that termination is in the best interests of the child. The superior court found that the "best interests of the child will be promoted by terminating [David's] parental rights." It found that David could not provide Hannah with a "stable" and "permanent" home. David notes that the superior court found that it would be in Hannah's best interests to be placed in a permanent home, but that placement with the maternal grandfather "has not worked out."

At the time of termination, Hannah had been placed with her maternal grandfather and his wife, but about six months later OCS ended this placement. OCS argues that such "subsequent events ... cannot be used to undermine a court's substantive decisions." Appellate Rule 210(a) provides that "the record does not include documents or exhibits filed after ... the filing date of the notice of appeal." In other words, the disruption in Hannah's placement following trial is no basis for upsetting the trial court's finding. In any event, David's main argument is that Hannah should have been placed with his mother, Claire, but OCS thoroughly explored the option of placing Hannah with Claire before deciding it was not appropriate in this case. The evidence in this case amply supports OCS's determination.

### F. It Was Not Plain Error For The Superior Court To Find That Claire Is Not An Indian Custodian.

██ David argues that the superior court should have determined at the beginning of the case whether to designate Claire as Hannah's Indian custodian. "Indian custodian" is a term of art under ICWA, defined as "any Indian person who has legal custody of an Indian child under tribal law or custom or under State law or to whom temporary physical care, custody, and control has been transferred by the parent of such child." [49] ICWA grants "Indian custodians" several rights, including the right to notice of termination proceedings [50] and the opportunity to participate in them.[51]

David acknowledges that "[t]his issue was not raised below as it should have been by the State and David's attorney" but argues that we should reverse the superior court for plain error. David argues that, had Claire been properly treated as an Indian custodian, the State would have had the burden of showing that placement with Claire would be harmful to Hannah. David also contends that the State would have had to make "active efforts" on behalf of Claire.[52] David argues that "if Hannah was placed with her [paternal] grandmother while her father was incarcerated, the course of events in this case may have been different."

The State responds that Claire is not an "Indian custodian" because she is not a "custodian" and she is not an "Indian." David argues that Claire was a custodian because he gave "his mother a power of attorney over his legal affairs and his children's needs."

ICWA requires that an "Indian custodian" be an "Indian person." [53] ICWA defines "Indian" as "any person who is a member of an Indian tribe, or who is an Alaska Native and a member of a Regional Corporation as defined in section 1606 of Title 43." [54]

Claire is not an Indian as defined by ICWA. At the 2010 placement hearing, Claire acknowledged that she was not an enrolled member of any tribe but argued that she had Chippewa and Sioux heritage. Claire

---

49. 25 U.S.C. § 1903(6) (2006).

50. *Id.* § 1912(a).

51. *Id.* § 1911(c).

52. In a separate hearing, Claire argued that she was an "Indian custodian." After Hannah was removed from the grandparents' residence in May 2010, a placement hearing was held in October and November 2010. At this hearing, Claire argued that she was an "Indian custodi-

an" and thereby entitled to appointed counsel. We note that ICWA does not explicitly state that active efforts must be made on behalf of Indian custodians, and we do not express an opinion on the matter.

53. 25 U.S.C. § 1903(6).

54. *Id.* § 1903(3).

claimed that she was in the process of investigating her eligibility.

▬▬▬ Being a member of an Indian tribe is a formal status. Tribes determine their own membership, and membership rolls are compiled by the BIA.[55] In *Bruce L. v. W.E.*, we discussed what it means to be a "member" of an Indian tribe.[56] We quoted BIA guidelines which state that "determination by a tribe that a child is or is not a member of ... or ... eligible for membership in that tribe, or that the biological parent is or is not a member of that tribe is conclusive." [57] In this case, it is undisputed that Claire was not a member of any Indian tribe at the time of the trial court proceedings. Therefore, ICWA's requirement that an Indian custodian be a "member" of an Indian tribe precludes a determination that she was an Indian custodian.

### G. The Superior Court Did Not Err In Finding That David's Counsel Was Not Ineffective.

On November 30, 2010, David, now represented by a different attorney, filed a motion under Civil Rule 60(b)(6) to set aside the judgment terminating his parental rights. David alleged various failings by his trial attorney, including the attorney's failure to prepare adequately for trial and failure to ensure that David understood his rights. The superior court held an evidentiary hearing on this motion over five days in January and February 2011. The superior court denied David's motion on February 10, 2011. The superior court found that, although trial counsel "could and should have done more," the "factual findings upon which termination was premised in 2009 are largely undisputed."

55. 25 C.F.R. § 61.2 (2011).

56. 247 P.3d 966, 975 n. 22 (Alaska 2011).

57. *Id.* (quoting Guidelines for State Courts; Indian Child Custody Proceedings, 44 Fed.Reg. 67,-584, 67,586 (Nov. 26, 1979)).

58. 813 P.2d 276, 283 n. 6 (Alaska 1991).

59. 666 P.2d 42, 45 (Alaska 1983).

60. *Id.* at 46; *see also S.B. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.*, 61

### 1. Standard for ineffective assistance claims in CINA cases.

In the *Matter of K.L.J.*, we held that indigent parents in a termination proceeding have a constitutional right to appointed counsel.[58] In *V.F. v. State*, we held that "the effective assistance of counsel is also constitutionally required." [59] In *V.F.* we applied the standard for ineffective assistance set out in the criminal context in *Risher v. State*.[60] In *Risher* we "promulgat[ed] a two-pronged test":

> Before reversal will result, there must first be a finding that counsel's conduct either generally throughout the trial or in one or more specific instances did not conform to the standard of competence which we have enunciated. Secondly, there must be a showing that the lack of competency contributed to the conviction. If the first burden has been met, all that is required additionally is to create a reasonable doubt that the incompetence contributed to the outcome.[61]

In *State v. Jones*, the Alaska Court of Appeals elaborated as follows:

> In evaluating trial counsel's conduct, the court must apply a strong presumption of competence. An integral component of the presumption of competence is the further presumption that trial counsel's actions were motivated by sound tactical considerations. The duty of rebutting this presumption is part and parcel of the accused's burden of proof: "[T]he defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." [62]

P.3d 6, 15–16 (Alaska 2002) (applying *Risher* standard); *P.M. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.*, 42 P.3d 1127, 1131 (Alaska 2002) (applying *Risher* standard).

61. 523 P.2d 421, 425 (Alaska 1974).

62. 759 P.2d 558, 569 (Alaska App.1988) (quoting *Strickland v. Washington*, 466 U.S. 668, 689, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)) (internal citations omitted).

We have applied the *Risher* standard in two parental termination cases decided after *V.F.*: in *S.B. v. State*[63] and in *P.M. v. State.*[64]

David invites us to abandon or alter the *Risher* standard for parental termination cases. David "suggests that this court establish a new standard for the effective assistance of counsel which is specific to Child in Need of Aid Proceedings." David urges us to look to other jurisdictions, such as Oregon, which have done just that. We decline to do so. In *V.F.*, we adopted the *Risher* standard as the appropriate standard for CINA cases.[65] We have stated that "we will overrule a prior decision only when clearly convinced that the rule was originally erroneous or is no longer sound because of changed conditions, and that more good than harm would result from a departure from precedent." [66] David fails to make any argument that we should overrule our controlling precedent under this standard, and we perceive no reason to do so.

### 2. David's counsel did not provide ineffective assistance.

#### a. The performance of David's attorney before and during trial

David first argues that his attorney underperformed at trial, detailing a variety of alleged failings. David argues that his attorney did not meet with him enough before trial and that their first in-person meeting was focused on whether David would relinquish his parental rights. At the hearing on David's Civil Rule 60(b)(6) motion, it was explained that this choice was strategic because with relinquishment David would retain some visitation rights while with termination he would have none. The attorney explained that he had spoken with David numerous times by phone and had even tried to contact David while David was a fugitive. The attorney explained that he was available to speak with David whenever David wished

to call and would have met in person had David wanted that.

David also argues that his trial attorney should have performed a "dry run" of David's testimony. Although there was testimony at the Rule 60(b) hearing that rehearsal of the client's testimony is standard, the State maintains that David "had a full opportunity to present whatever testimony he felt should have been presented at the termination trial."

David also argues that his attorney was overly passive during trial, declining to ask questions of some witnesses or asking inconsequential questions. The State counters that trial counsel's decisions were strategic, explaining that "it is not sound strategy to cross-examine a witness whose answers may not be beneficial to your client." Although David's expert witness testified that she had never participated in a termination trial with so few questions, the State responds that David has not established any prejudice and "simply summarizes who testified at the termination trial and whether [his attorney] cross-examined that person."

David also challenges the adequacy of his attorney's closing argument. The attorney's closing argument was short, stating in its entirety:

> I have just a few brief comments. We believe that [David], if given the opportunity, would be a suitable parent for his child. And he's been struggling, rightly, with his addictions and he'd usually do—he often does fairly well, and we think with more effort, that he could be a suitable parent.

David's expert testified that the brevity of this closing argument was "shocking." But the State's closing argument was not long either, addressing only the required elements and findings needed to support termination of parental rights under AS 47.10.011(1), (2), and (10).

The first prong of the *Risher* test calls for evaluating the standard of the attorney's per-

---

**63.** 61 P.3d at 15–16.

**64.** 42 P.3d at 1131.

**65.** 666 P.2d at 46.

**66.** *State, Commercial Fisheries Entry Comm'n v. Carlson,* 65 P.3d 851, 859 (Alaska 2003) (citing *Pratt & Whitney Canada, Inc. v. Sheehan,* 852 P.2d 1173, 1176 (Alaska 1993)) (internal quotation marks omitted).

formance at the termination trial. It asks whether the attorney's performance was at a level that "no reasonably competent attorney would provide." [67] We have reviewed the question whether counsel's performance fell below minimally acceptable standards in several previous decisions.[68] *V.F. v. State* is the only case we have decided that bears any factual resemblance to this one. In that case, V.F. made three arguments to support her claim that her attorney did not provide effective assistance.[69] First, she argued that she misunderstood the attorney's role and did not realize until shortly before the hearing that he represented her.[70] But we found that she "was informed of the appointment." [71] Second, V.F. argued that her attorney "failed to argue that the proceeding should have been governed by the Indian Child Welfare Act." [72] We concluded that this would "not have contributed to the outcome of the hearing" as the proceedings did substantially comply with ICWA.[73] Third, V.F. argued that her attorney failed to call her boyfriend as a witness, who arguably could have established that V.F. could provide a "good, stable environment for her children." [74] We concluded that the failure to subpoena this witness was a "strategic decision" that did not fall "outside of the range of reasonable actions which might have been taken by an attorney." [75]

In this case, trial counsel demonstrated a willingness to work with David and respond to his concerns. He offered strategic reasons for his trial decisions, and David did not prove otherwise. Although the superior court found that counsel's performance was substandard insofar as he did not conduct a run-through of David's testimony prior to his taking the stand, it is unclear that this mistake "fell outside of the range of reasonable actions which might have been taken by an attorney skilled in the . . . law." [76]

Perhaps more importantly, David did not show how an improved or more aggressive performance would have made a difference in the outcome of his case. At the conclusion of closing arguments, the superior court noted: "This is in my view not a close case." Nonetheless, David argues that his "trial counsel could have raised the issue that David [ ] had an adequate plan in place for Hannah's care during his incarceration." But incarceration was only one of the three grounds on which the superior court found Hannah to be a child in need of aid. And David did not dispute the factual bases for the superior court's rulings on the other two grounds: abandonment based on his nine-month flight from the authorities and substance abuse based on his methamphetamine and marijuana use. In *In re M.B.*, the Vermont Supreme Court declined to find ineffective assistance in a termination case because the parent "fail[ed] to specify what additional, relevant evidence would have been provided" had counsel been more effective.[77] Similarly, David does not specify how he thinks the trial would have been different if his counsel had taken a different approach. As such, he has not met the prejudice prong of the *Risher* test.[78]

### b. David's desire to place Hannah with Claire

David makes a series of arguments related to his desire to have Hannah placed with his mother, Claire. David argues that an attor-

---

**67.** *Jones,* 759 P.2d at 568 (citing *Brown v. State,* 601 P.2d 221, 234 (Alaska 1979)).

**68.** *V.F.,* 666 P.2d at 45; *S.B.,* 61 P.3d at 15; *P.M.,* 42 P.3d at 1131–32.

**69.** 666 P.2d at 46.

**70.** *Id.*

**71.** *Id.*

**72.** *Id.*

**73.** *Id.* at 46–47.

**74.** *Id.* at 47.

**75.** *Id.* (quoting *Risher v. State,* 523 P.2d 421, 424 (Alaska 1974)) (internal quotation marks omitted).

**76.** *Id.*

**77.** *In re M.B.,* 162 Vt. 229, 647 A.2d 1001, 1005 (1994).

**78.** 523 P.2d at 424 (for a finding of ineffective assistance, "[t]he conduct of counsel must have contributed to the eventual conviction").

ney in a CINA case acts as "both an advocate for and a counselor to a client" and that his attorney failed in this latter role. David contends that his attorney should not have advised him to stipulate that Hannah was a child in need of aid in April 2008 when she was taken into custody by the State. David also argues that his counsel "failed to advocate for the placement of Hannah with her paternal grandmother, Claire." David relies on his expert witness's statement that "[the] attorney's failure to advocate for placement adequately with Claire [ ] fell below the standards of representation."

The State responds that OCS "actively pursued placement with Claire" and that it is therefore inconsequential whether David's attorney "should have done more to ensure that Hannah was placed with Claire." The State concentrates its arguments on the prejudice prong of the *Risher* test.

Even if trial counsel did fail to pursue placement with Claire, that is not relevant to a claim that he provided ineffective assistance in David's termination proceedings. Further, OCS undertook considerable efforts to place Hannah with Claire. David does not specify what else his attorney might have argued that OCS should have done. The opportunity to place Hannah with Claire seems to have been robustly explored, and it is unclear what additional advocacy for this option would have accomplished. Accordingly, David's argument does not satisfy the prejudice prong of the *Risher* test.

Finally, David argues that his attorney "failed to recognize that Claire [ ] may have standing as an Indian Custodian." David claims that Diane's delegation of parental rights to Claire via a power of attorney was "consistent with tribal practice and custom and is exactly the type of issue that ICWA is designed to protect." But as discussed above, this argument also fails the prejudice prong of the *Risher* test because Claire does not, in fact, have standing as an Indian custodian. Because Claire was not an "Indian custodian," it could not have benefitted David to argue that she was.

## V. CONCLUSION

For the reasons described above, we AFFIRM in all respects the superior court's order terminating parental rights and the superior court's order denying David's Civil Rule 60(b)(6) motion to set aside judgment due to ineffective assistance of counsel.