NOTICE

*Memorandum decisions of this court do not create legal precedent. A party wishing to cite such a decision in a brief or at oral argument should review Alaska Appellate Rule 214(d).*

THE SUPREME COURT OF THE STATE OF ALASKA

BERNADETTE K., )
)
Appellant, )
)
v. )
)
STATE OF ALASKA, )
DEPARTMENT OF HEALTH & )
SOCIAL SERVICES, OFFICE OF )
CHILDREN'S SERVICES, )
)
Appellee. )
_____ )
)
JEROME O., )
)
Appellant, )
)
v. )
)
STATE OF ALASKA, )
DEPARTMENT OF HEALTH & )
SOCIAL SERVICES, OFFICE OF )
CHILDREN'S SERVICES, )
)
Appellee. )
_____ )

Supreme Court Nos. S-16334/16354
(Consolidated)

Superior Court Nos. 3AN-14-00292/
293/294/295 CN

MEMORANDUM OPINION
AND JUDGMENT*

No. 1637 – June 21, 2017

Appeal from the Superior Court of the State of Alaska, Third
Judicial District, Anchorage, Gregory Miller, Judge.

---

\*      Entered under Alaska Appellate Rule 214.

Appearances: Olena Kalytiak Davis, Anchorage, for Appellant Bernadette K. Jason A. Gazewood, Anchorage, for Appellant Jerome O. Kimberly D. Rodgers, Assistant Attorney General, Anchorage, and Jahna Lindemuth, Attorney General, Juneau, for Appellee.

Before: Stowers, Chief Justice, Winfree, Maassen, Bolger, and Carney, Justices.

## I.    INTRODUCTION

The superior court terminated the parental rights of a mother and father, citing a history of domestic violence, substance abuse, and child neglect and the parents' failure to fully engage with the Office of Children's Services (OCS) and remedial programs.  The court acknowledged that the parents had made progress in improving their parenting abilities and complying with their OCS case plans, but it ultimately adopted OCS's position that these efforts were "too little, too late."

Both parents appeal.  They argue that the superior court erred in several important factual findings:  that the mother did not remedy, within a reasonable time, the conduct and conditions that placed her children at risk; that OCS made reasonable efforts to reunify the family; and that termination was in the children's best interests.  In addition, the father argues that his limited comprehension of English added to the unreasonableness of OCS's efforts and rendered ineffective his counsel's assistance during court proceedings.

Finding no error, we affirm the superior court's decision.

## II.    FACTS AND PROCEEDINGS

Bernadette K. and Jerome O. became romantically involved in 2007 and now have three children: Ashton, Cordelia, and Yasmine.[1] Throughout their relationship Jerome abused Bernadette physically and emotionally; Bernadette sought several domestic violence protective orders against him and was granted at least two. Between 2007 and 2014 Jerome was often incarcerated. In 2012 he was convicted of assaulting Bernadette and ordered to have no further contact with her. Meanwhile Bernadette struggled with depression, anxiety, post-traumatic stress disorder (PTSD), daily substance abuse, and possibly bipolar disorder.

OCS's involvement with the family began in 2007. In July 2014 it took the children into emergency custody after verifying reports of abuse and domestic violence.

The children all had serious physical and mental health issues. All three had rotten teeth and required dental surgery. The girls were behind on vaccines. Cordelia and Yasmine had trouble sleeping, threw aggressive tantrums, and showed no ability to manage their emotions. Ashton also had violent tantrums and difficulty sleeping.

In October 2014 the superior court adjudicated the three children as children in need of aid under AS 47.10.011, basing its decision on abandonment, parental incarceration, neglect, medical neglect, physical harm, mental injury, and domestic violence. Bernadette did not appear at the hearing, but Jerome stipulated that the children were in need of aid on these grounds.

The children were difficult to place in foster care because of their acute mental health issues. After Yasmine and Cordelia proved too challenging for a number of different foster homes, OCS placed them in a therapeutic foster home where they

---

[1]     We use pseudonyms for all family members to protect their privacy.

continued to live until trial. Ashton was admitted to North Star Behavioral Center in July 2014 after two brief, unsuccessful foster placements. North Star released him in October 2014 and he lived at a different therapeutic foster home until trial.

Over the months following removal, OCS met with Bernadette on a number of occasions to develop her case plan and refer her to rehabilitative services. She took advantage of some of these referrals, staying briefly at an abused women's shelter and enrolling in counseling. OCS gave her bus passes and cab fares. Jerome, on the other hand, was incarcerated when OCS took custody of the children, and after his release he missed most of his scheduled case planning meetings.

In December 2014 OCS developed case plans for the parents that included, among other things, psychological evaluations, substance abuse assessments, drug testing, applying for Social Security disability benefits, treatment for mental health issues (including therapy and medication), domestic violence classes, parenting classes, family therapy, and safe, stable housing. Jerome's first language is Spanish, and he asserts that his limited grasp of English interfered with his ability to understand what was expected of him. His caseworkers testified, however, that they were able to communicate "pretty well" with him without an interpreter.

Bernadette had a mental health assessment in November 2014. It concluded that she loved her children "and would be safe to have supervised visits" but that "full time parenting of four children,[2] some with special needs, [was] probably unrealistic." Bernadette left Jerome in January 2015 and began taking classes on boundaries, finances, and domestic violence. She also participated in an outpatient substance abuse assessment and treatment program, though she did not complete it. According to OCS, Bernadette missed several case planning meetings and drug testing appointments in late 2014 and

---

[2]    Bernadette has one other child not at issue in this proceeding.

early 2015. Jerome continued to miss case planning meetings as well and missed all of his scheduled drug tests. He also missed a scheduled substance abuse assessment in August 2015.

OCS filed a petition to terminate the rights of both parents in November 2015. Bernadette had been convicted of criminal mischief a few weeks earlier and was briefly incarcerated. Shortly after her release she had a second substance abuse assessment, which recommended intensive outpatient treatment. She did not enroll in a treatment program, but in late 2015, as a condition of her probation, she had three urinalysis tests, all negative (though on another occasion she refused to be tested). In January 2016 she began taking parenting classes and applied for Social Security benefits; her Social Security application was not complete when the termination trial began in March 2016 but was ultimately successful.

Jerome had a substance abuse assessment shortly before trial, but he did not complete any substance abuse treatment, domestic violence classes, anger management counseling, or a mental health assessment.

The superior court held a four-day termination trial in March and April 2016. Early in the proceedings Jerome indicated that he did not understand much of what was being said and requested an interpreter. The court arranged for Spanish-language interpreters, reminding Jerome's counsel that it was his responsibility to arrange for an interpreter if his client required one.[3]

The court heard testimony from five OCS caseworkers, two OCS supervisors, the children's therapists, the girls' long-term therapeutic foster mother, and Bernadette. Jerome chose not to testify.

---

[3]     The governing rule has since changed. *See* Alaska Admin. R. 6(b); Alaska Supreme Court Order No. 1896 (Sept. 21, 2016) (effective Oct. 15, 2016).

The court ultimately concluded that OCS had met its burden under AS 47.10.088 to terminate the rights of both parents. It found by clear and convincing evidence that the three children were children in need of aid on grounds of neglect, abandonment, mental harm due to domestic violence, substantial risk of harm due to the parents' mental health, and substantial risk of harm due to the parents' substance abuse.[4] The court found that Cordelia and Yasmine were children in need of aid on a sixth ground as well: risk of substantial physical harm.[5] The court found by clear and convincing evidence that the parents had failed to remedy the problems that endangered the children and that OCS had made reasonable efforts to reunify the family. Finally, it found by a preponderance of the evidence that terminating parental rights was in the children's best interests. The court's oral decision emphasized the parents' history of substance abuse and domestic violence, their lack of stability, and their slow progress in completing the requirements of their case plans.

Both parents appeal. Bernadette argues that she remedied her problematic conduct, that OCS did not make reasonable efforts to reunify the family, and that it was not in the children's best interests to terminate her parental rights. Jerome makes a reasonable-efforts argument as well and also contends that he received ineffective assistance of counsel due to his attorney's failure to recognize his limited English comprehension and ensure that he had an interpreter.

---

[4] *See* AS 47.10.011(1) (abandonment), (8) (mental harm due to domestic violence), (9) (neglect), (10) (substantial risk of harm due to parental substance abuse), (11) (substantial risk of harm due to parental mental health).

[5] *See* AS 47.10.011(6).

## III. STANDARDS OF REVIEW

"In a child in need of aid (CINA) case, we review a superior court's findings of fact for clear error."[6] "We will find clear error only when a review of the entire record leaves us 'with a definite and firm conviction that the superior court has made a mistake.' "[7]

"We review de novo whether a trial court's findings satisfy the requirements of the child in need of aid statute."[8] "Whether the parent has 'remedied the conduct or conditions . . . that place the child at substantial risk' and whether 'returning the child to the parent would place the child at substantial risk of physical or mental injury' are factual determinations best made by a trial court after hearing witnesses and reviewing evidence, not legal determinations to which an appellate court should apply its independent judgment."[9] "Whether OCS made reasonable efforts to reunify the family," however, "is a mixed question of law and fact."[10]

---

[6] *Barbara P. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 234 P.3d 1245, 1253 (Alaska 2010) (citing *Brynna B. v. State, Dep't of Health & Soc. Servs, Div. of Family & Youth Servs.*, 88 P.3d 527, 529 (Alaska 2004)).

[7] *David S. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 270 P.3d 767, 774 (Alaska 2012) (citing *S.H. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.*, 41 P.3d 1119, 1122 (Alaska 2002)).

[8] *Barbara P.*, 234 P.3d at 1253 (citing *Carl N. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.*, 102 P.3d 932, 935 (Alaska 2004)).

[9] *Id.* (alteration in original) (first quoting AS 47.10.088(a)(2)(A); then quoting AS 47.10.088(a)(2)(B)).

[10] *Emma D. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 322 P.3d 842, 849 (Alaska 2014).

Jerome raises his ineffective assistance claim for the first time on appeal; we review such claims de novo.[11]

## IV. DISCUSSION

### A. The Trial Court Did Not Clearly Err In Concluding That Bernadette Failed To Remedy The Conduct And Conditions That Caused The Children To Be Children In Need Of Aid.

The superior court noted that at the time of trial Bernadette was "meeting [the] goals of her most recent case plan" and "willing to do whatever else OCS require[d]." It found that Bernadette's efforts were nevertheless "insufficient" and that there was "far too little hope of success." Bernadette argues that this last finding was error; she contends that the court overlooked evidence that she had changed her behavior, improved her living situation, and substantially complied with her case plan. In brief, she argues that "[s]he had changed her life," largely without OCS assistance. But we conclude that the superior court did not clearly err.

In order to terminate parental rights the superior court must find "by clear and convincing evidence" that the parent "has failed, within a reasonable time, to remedy the conduct or conditions in the home" that endangered the child, and that "returning the child to the parent would place the child at substantial risk of physical or mental injury."[12] This standard permits a court in some circumstances to terminate parental rights even though the parent has demonstrated notable improvement or complied with her case plan. "Compliance with treatment plans does not guarantee that parental rights will not be terminated because it cannot guarantee that adequate parenting skills will be

---

[11]    *See Chloe W. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 336 P.3d 1258, 1266-67 (Alaska 2014) ("[W]e have decided [ineffective assistance] claims on direct appeal when the issue was not raised in the trial court.").

[12]    AS 47.10.088(a)

acquired from the treatment regimen."[13] And recent improvements notwithstanding, the court is "entitled to rely on a parent's documented history of conduct as a predictor of future behavior."[14]

The record here supports the superior court's finding that the parents' history showed a "repeated pattern of substance abuse, incarceration, [and] domestic violence." The record also supports the court's assessment that the parents had still not acquired the necessary parenting skills to assume full-time custody of the children. The court relied on testimony that "the children did poorly under their biological parents, and [had] done well" in foster care. It credited testimony that all three children needed "special care." There was testimony that all three suffered from serious mental injuries and disorders that made caring for them exceptionally difficult.

The evidence also supports a conclusion that Bernadette did not understand the extent of the children's needs or have the skills necessary to protect them from future harm. After OCS took custody of the children, she repeatedly minimized the gravity of the situation. For example, she dismissed a report of sexual abuse, telling an OCS caseworker that "whoever made the report[] should be in jail because they're creating more problems." The same OCS caseworker testified that Bernadette minimized the impact of domestic violence on the children, denying "that the neglect or the domestic

---

**13**     *V.S.B. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.*, 45 P.3d 1198, 1208 (Alaska 2002) (citing *In re T.W.R.*, 887 P.2d 941, 945 (Alaska 1994)); *cf. Barbara P.*, 234 P.3d at 1261 ("The superior court's finding that Barbara had been sober at least since Gary's birth, slightly less than six months preceding her termination trial, does not preclude a finding that she had failed to remedy her substance abuse problem." (footnote omitted)).

**14**     *Sherry R. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.*, 74 P.3d 896, 903 (Alaska 2003).

violence had anything to do with the kids [being] in custody." Bernadette testified at trial that Yasmine's teeth were "pretty good" despite overwhelming evidence to the contrary.

The superior court also heard evidence that Bernadette never internalized or understood the ways in which her behavior adversely affected the children. The girls' foster parents reported that Bernadette responded to the girls in insensitive and counterproductive ways during visits. And she regularly missed visits with them, prompting the girls' treatment team to recommend that the visits be discontinued; the girls experienced "emotion[al] disregulation" and tantrums after Bernadette missed a visit and would cry and hit one another.

Bernadette argues that the superior court overlooked the progress she made on her case plan, but the court expressly acknowledged that she had met many of the plan's goals. By the time of trial, however, she still had not completed substance abuse treatment or a long period of sobriety. She refused urinalysis testing as late as November 2015 and missed several other urinalysis appointments. The court was entitled to rely on her history, including these recent lapses, as a "predictor of future behavior."[15]

Finally, Bernadette claims the superior court improperly factored her income into its decision. In its oral remarks the court observed that Bernadette "still does not have a job, . . . doesn't have a firm place to live that would benefit the children, . . . doesn't have stability in her life, . . . [and] doesn't have the ability to care for the children." The court's comments did not clearly differentiate between economic and noneconomic factors, and without context its statements could be read to suggest that it improperly considered the parents' relatively poor economic status.[16] But the court went

---

[15] AS 47.10.088(b); *Sherry R.*, 74 P.3d at 903.

[16] AS 47.10.019 states that "the court may not find a minor to be a child in need of aid under this chapter solely on the basis that the child's family is poor, lacks

(continued...)

on to expressly recognize that it "cannot and is not holding against her or [Jerome] their lower income levels. That would be improper." The court's conclusions ultimately focused not on the parents' economic wherewithal but on their willingness and ability to meet their children's most basic needs.

We conclude that the court did not clearly err in finding that Bernadette failed to remedy the conduct or conditions that caused her children to be at risk of harm.

**B.    The Trial Court Did Not Err In Concluding That OCS Made Reasonable Efforts To Reunify The Family.**

Both parents argue that OCS did not make reasonable efforts to reunify the family. Before the superior court terminates parents' rights it must find by clear and convincing evidence that OCS made timely, reasonable efforts to reunite the parents with their children.[17] The Alaska Statutes require OCS to (1) "identify family support services that will assist the parent . . . in remedying the conduct"; (2) "actively offer" and "refer the parent" to these services; and (3) document its actions.[18] OCS fulfills its duty to make reasonable efforts when it "set[s] out the types of services that a parent should avail . . . herself of in a manner that allows the parent to utilize the services."[19] OCS's efforts

---

[16](...continued)
adequate housing, or exhibits a lifestyle that is different from the generally accepted lifestyle standard of the community where the family lives."

[17]     AS 47.10.086(a); AS 47.10.088(a)(3).

[18]     AS 47.10.086(a).

[19]     *Audrey H. v. State, Office of Children's Servs.*, 188 P.3d 668, 679 (Alaska 2008) (quoting *Frank E. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.*, 77 P.3d 715, 720 (Alaska 2003)).

need not be perfect; they need only be reasonable under the circumstances.[20] The parent's willingness to cooperate with OCS[21] and to participate in treatment[22] are relevant to the reasonableness of OCS's efforts. In general, OCS's responsibility to reunify diminishes as the parent's own demonstrated commitment to reunification decreases.[23]

To support her argument that OCS did not make reasonable efforts, Bernadette points to the fact that the children went through nine different foster placements in the three months after OCS assumed custody. But the record shows that the changes in placement resulted not from OCS ineptitude but from the children's acute behavioral issues. An OCS specialist testified that some caregivers were simply "not able to meet [the children's] needs because their behaviors were so significant and they were not safe for themselves or for other people."

Both Bernadette and Jerome also observe that there were seven caseworkers involved in their cases over a span of just two years, which they cite as evidence that OCS's efforts were not reasonable. The superior court agreed that "there were more caseworkers than anyone would want." But the record supports a conclusion that the changes of personnel did not appreciably hinder OCS's efforts to "identify family support services" or "actively offer" and "refer the parent[s] . . . to these services."[24]

---

[20] *Id.* at 678 ("The efforts that OCS makes must be reasonable but need not be perfect." (citing *Jeff A.C., Jr. v. State*, 117 P.3d 697, 706 (Alaska 2005))).

[21] *Sherman B. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 310 P.3d 943, 953-54 (Alaska 2013).

[22] *Amy M. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 320 P.3d 253, 259 (Alaska 2013).

[23] *Audrey H.*, 188 P.3d at 679 (citing *Jeff A.C, Jr.*, 117 P.3d at 707).

[24] *See* AS 47.10.086(a).

OCS repeatedly referred both parents to rehabilitative services beginning just after removal and continuing until trial. These included counseling, shelters, mental health and substance abuse assessments, substance abuse treatment, and parenting classes. OCS offered to pay for transportation, and in some cases it scheduled the parents' appointments. The record supports the superior court's conclusion that the turnover in caseworkers did not prevent OCS from meeting its statutory obligations.[25]

The parents' argument that OCS's rehabilitative efforts were insufficient also fails. Bernadette claims that OCS caseworkers did not meet with her frequently enough, did not monitor her progress or schedule drug tests to confirm that she was sober, and ignored her progress in complying with her case plan. Jerome argues that OCS made "no efforts" to help him "remedy the conduct that made the children in need of aid." But the record supports the superior court's different conclusion: that much of the parents' difficulty in making progress was due to their missed calls, meetings, assessments, and drug tests.

Finally, both Jerome and Bernadette argue that their case plans violated OCS policy, citing the statement from an OCS manual that "[a] case plan must be developed within 60 days when a child is removed from the home." OCS drafted Jerome's and Bernadette's case plans in December 2014, approximately five months after it took emergency custody of the three children. But OCS met with the parents and offered to refer them to rehabilitative services shortly after the removal, then continued to assist the parents until the termination trial began. Because OCS met its statutory

---

[25]     We recognize the challenges OCS faces in recruiting and retaining a sufficient number of caseworkers, especially in rural areas and in the context of the State's current fiscal situation. A high turnover of caseworkers, in and of itself, is unlikely to show that OCS failed to make reasonable efforts to unify the family.

obligations despite the lack of a formal case plan, we conclude that the superior court did not err in finding that it made timely, reasonable efforts to reunify the family.[26]

**C.     The Trial Court Did Not Clearly Err In Finding That Terminating Parental Rights Was In The Children's Best Interests.**

Bernadette's final argument is that termination was not in the children's best interests.  Alaska Statute 47.10.088(c) allows the court in making a best interests determination to consider any fact relating to the best interests of the child, including but not limited to these:

> (1) the likelihood of returning the child to the parent within a reasonable time based on the child's age or needs;
>
> (2) the amount of effort by the parent to remedy the conduct or the conditions in the home;
>
> (3) the harm caused to the child;
>
> (4) the likelihood that the harmful conduct will continue; and
>
> (5) the history of conduct by or conditions created by the parent.[27]

---

[26]     *Accord Dashiell R. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 222 P.3d 841, 849 (Alaska 2009).  Jerome also argues that OCS's efforts were unreasonable because his case plan confusingly listed goals in the present tense, as if he had already completed them:  for example, "[Jerome] is feeling well and healthy, enough to set aside his own emotions and provide[] [for] his children's basic needs."  The superior court observed that the case plan "was written in an odd way" and suggested that OCS "seriously consider changing its way of using th[e] present tense."  The court nevertheless found that the way the plan was written did not affect the parents' performance, as "each of the case workers always sat down with the parents and explained the case plan."  The record supports this finding.

[27]     *Barbara P. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 234 P.3d 1245, 1263 n.53 (Alaska 2010) (quoting AS 47.10.088).

In past cases involving young children and children with special needs, we have also emphasized their need for permanency, stability, and support.[28]

Bernadette argues that the superior court failed to "rationally discuss" any of the statutory best interest factors. Courts are not required to consider all factors in every case; rather, a court may " 'consider any fact relating to the best interest of the child, including' the statutory factors."[29] Here the court did discuss "the history of conduct by or conditions created by the parent[s]," "the likelihood of returning the child[ren] to the parent within a reasonable time based on the [children's] age or needs," "the harm caused to the [children]," and "the amount of effort by the parent[s] to remedy the conduct or conditions in the home." The court considered evidence that the parents had neglected and traumatized the children; that neither parent had yet demonstrated the necessary skills to care for the children; and that the children's behavior and mental health had improved dramatically in foster care. We conclude that the court did adequately consider the factors bearing on the children's best interests.

Bernadette also argues that the superior court overlooked important facts that do not support termination. For example, she claims the superior court ignored evidence that she had left Jerome and started a stable, nonabusive relationship with a different partner and evidence that the children "lack[ed] . . . consistency and stability" in foster care. But the court acknowledged these and other facts that favored Bernadette. While it noted that Bernadette had left Jerome, it also recognized that her progress was recent. And while the court acknowledged that the children had been moved often while in OCS custody, it recognized the reasons for it, as explained above, and it credited

---

[28]     *See, e.g., id.* at 1263; *Shirley M. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 342 P.3d 1233, 1243 (Alaska 2015).

[29]     *Barbara P.*, 234 P.3d at 1263-64 (quoting AS 47.10.088(b)).

testimony that the children were improving in foster care after having suffered, both physically and emotionally, in the care of their parents. We conclude that the court did not err when it found, by a preponderance of the evidence, that termination was in the children's best interests.

**D.    The Lack Of A Spanish Interpreter Did Not Render OCS's Efforts Unreasonable Or Counsel's Assistance Ineffective.**

Finally, Jerome argues that because he lacked a Spanish interpreter to help him understand and follow his case plan, OCS's reunification efforts cannot have been reasonable. Relatedly, he argues that he received ineffective assistance of counsel when his attorney failed to ensure that he had an interpreter during court proceedings. We conclude, however, that Jerome's need for an interpreter did not unreasonably hinder OCS's reunification efforts or the effectiveness of Jerome's representation in court.

First, Jerome cites no specific instances in which language difficulties prevented him from understanding his case plan, following its recommendations, or availing himself of services. His caseworkers testified that they could adequately communicate with him. Jerome does not allege that he ever requested interpretive help and was refused. In fact, when he asked for a Spanish speaker to conduct his mental health assessments, OCS obliged.

Instead of identifying specific ways in which his lack of English proficiency hindered his rehabilitative efforts, Jerome argues more generally that he often feigned understanding in order to ease his way through difficult and complex social interactions. But our focus here is on the reasonableness of OCS's actions. Given that Jerome's caseworkers believed they were adequately communicating with him; that Jerome never attempted to disabuse them of this impression; that he received interpretive help when he asked for it; and that he fails to identify any specific ways in which language was a barrier to his accomplishment, we cannot conclude that the superior court's finding of

reasonable efforts should have been different because of Jerome's alleged difficulties with the English language.

We also reject Jerome's claim that he received ineffective assistance of counsel.[30] We agree that litigants who lack proficiency in English may require interpretive assistance in order to adequately understand and participate in court proceedings in child in need of aid proceedings; counsel is generally in the best position to recognize this need beforehand.[31] We note parenthetically, however, that Alaska Administrative Rule 6 recently underwent significant change to more effectively achieve its stated goal of "promot[ing] meaningful participation in court proceedings, consistent with due process, by persons with limited English proficiency."[32] The Alaska Court System now takes the responsibility to "provide and pay for the necessary services of an

---

[30] *See Chloe W. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 336 P.3d 1258, 1265 (Alaska 2014) (recognizing the due process right to the effective assistance of counsel in termination proceedings (citing *S.B. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.*, 61 P.3d 6, 10 (Alaska 2002))).

[31] *See* former Alaska Admin. R. 6(c) (2013) ("If a party is represented by a public agency, or someone under contract to a public agency, the agency is responsible for providing and paying for necessary interpreter services required by the party and the party's witnesses."); former Alaska Admin. R. 6(d) ("If interpreter services are not the responsibility of the court system or a public agency, . . . the party is responsible for providing and paying for necessary interpreter services required by the party and the party's witnesses."); *Tsen v. State*, 176 P.3d 1, 8 (Alaska App. 2008) ("[T]rial judges are often untrained or ill-equipped to make language proficiency assessments." (citing Virginia E. Hench, *What Kind of Hearing? Some Thoughts on Due Process for the Non-English-Speaking Criminal Defendant*, 24 T. MARSHALL L. REV. 251, 272 (1999))).

[32] Alaska Supreme Court Order No. 1896 (Sept. 21, 2016) (effective Oct. 15, 2016).

interpreter during proceedings in court for all parties, witnesses, and victims with limited English proficiency," as well as certain other participants in litigation.[33]

We apply a two-part test to evaluate an ineffective assistance claim.[34] The first part requires the party claiming ineffective assistance to show that his "attorney's performance was below a level that any reasonably competent attorney would provide."[35] The second part requires the party to "demonstrate that [his attorney's] improved performance would have affected the outcome of the case."[36] We need not address the first part if the party cannot satisfy the second.[37]

Jerome does not demonstrate that "counsel's improved performance would have affected the outcome of the case."[38] As noted above, the superior court ensured that Jerome had access to interpretive services throughout the termination trial. Jerome does not allege that he was unable to communicate with his counsel, who was familiar with CINA litigation and cross-examined OCS's witnesses. Jerome does not claim that the language barrier hindered his attorney's efforts, only that Jerome himself sometimes struggled to understand. And he does not explain how the determinative issues in the court's termination decision — Jerome's history of substance abuse and domestic

---

[33]     Alaska Admin. R. 6(b).

[34]     *Chloe W.*, 336 P.3d at 1265 (citing *David S. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 270 P.3d 767, 784-86 (Alaska 2012)); *see also Risher v. State*, 523 P.2d 421, 45 (Alaska 1974).

[35]     *Chloe W.*, 336 P.3d at 1265 (citing *Chloe O. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 309 P.3d 850, 858-59 (Alaska 2013)).

[36]     *Id.* (citing *David S.*, 270 P.3d at 784).

[37]     *Id.* (citing *Stanley B. v. State, DFYS*, 93 P.3d 403, 408-09 (Alaska 2004)).

[38]     *See id.* (quoting *David S.*, 270 P.3d at 784).

violence, his evident unwillingness to engage with OCS or with rehabilitative services, and his lack of progress between removal and trial — could have been decided differently had he better understood the proceedings. With no showing that his attorney's "improved performance" would have changed the outcome of the case, we conclude that Jerome's claimed lack of proficiency in English did not deprive him of effective assistance of counsel.

V.      **CONCLUSION**

We AFFIRM the superior court's termination of Bernadette's and Jerome's parental rights.